Standard Form 50-B
Rev. 4/87
U.S. Office of Personnel Management
FPM Chapter 296

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| LANGE, TERESA K | 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 | 12/30/54 | 08/28/88 |

**FIRST ACTION** / **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| | CONV TO CAREER COND APPT | | |
| **5-C. Code** | **5-D. Legal Authority** | **6-C. Code** | **6-D. Legal Authority** |
| ACM | DD PT B 1133 | | |
| **5-E. Code** | **5-F. Legal Authority** | **6-E. Code** | **6-F. Legal Authority** |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | SURVYG TECHNCN<br>1114409 N5022 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 01 | 15,118.00 | | GS | 0817 | 05 | 03 | 16,126.00 | PA |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FOREST SERVICE<br>NORTH REG #REGION1#<br>DEERLODGE NATIONAL FOREST<br><br>BUTTE MT |

**EMPLOYEE DATA**

| 23. Veterans Preference (1—None, 2—5 Pt., 3—10 Pt. Disab., 4—10 Pt. Comp., 5—10 Pt. Other, 6—10 Pt./30% Comp.) | 24. Tenure (0—None, 1—Permanent, 2—Conditional, 3—Indefinite) | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| | 2 | | YES [ ] NO [X] |

| 27. FEGLI | 28. Annuitant Indicator (1—Reempl. Ann-CS, 2—RETO, 3—RETM, 4—RETO & CS, 5—RETM & CS, 9—Not Applicable) | 29. Pay Rate Determinant |
|---|---|---|
| BASIC | 9 | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule (F—Full-time, P—Part-time, I—Intermittent, G—FT Seasonal, Q—PT Seasonal, J—INT Seasonal, H—FT On Call, R—PT On Call) | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| FERS | 05/05/81 | F | |

**POSITION DATA**

| 34. Position Occupied (1—Competitive Service, 2—Excepted Service, 3—SES General, 4—SES Career Reserved) | 35. FLSA Category (E—Exempt, N—Nonexempt) | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 | N | | 7777 |

| 38. Duty Station Code | 39. Duty Station (City—County—State or Overseas Location) |
|---|---|
| 30-0180-093 | BUTTE SILVER BOW MT |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

INITIAL PROBATIONARY PERIOD COMPLETED.

13 PP FT; 13 PP CWN

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF AGRICULTURE | CLYDE G. MCSHAN, II |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| AG 11 | 5033 | 09/02/88 | DIRECTOR OF THE NFC |

5-Part 50-307 2—OPF Copy—Long-Term Record—DO NOT DESTROY Previous Editions Unusable After 9/30/88 NSN 7540-01-250-0482

1101089000005000000 DD 10 1*1988*BATCH 50330001 000-00 425-01 AG/FO 11-5033

Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

1. Name (Last, First, Middle): LANGE, TERESA K
2. Social Security Number: 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
3. Date of Birth: 12/30/54
4. Effective Date: 06/02/91

**FIRST ACTION**

5-B. Nature of Action: PROMOTION
5-C. Code: N3M
5-D. Legal Authority: REG 335.102 COMP
5-E. Code:
5-F. Legal Authority:

**SECOND ACTION**

6-A. Code:
6-B. Nature of Action:
6-C. Code:
6-D. Legal Authority:
6-E. Code:
6-F. Legal Authority:

7. FROM: Position Title and Number
RESOURCE CLK
1144709 N5208

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | 1101 | 05 | 05 | 19,237.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| 19,237.00 | .00 | 19,237.00 | .00 |

14. Name and Location of Position's Organization

15. TO: Position Title and Number
CIVIL ENGRG TECHNCN
1159009 N5052

| 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| GS | 0802 | 07 | 01 | 21,023.00 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| 21,023.00 | .00 | 21,023.00 | .00 |

22. Name and Location of Position's Organization
FOREST SERVICE
NORTH REG #REGION1#
BEAVERHEAD NATIONAL FOREST

**EMPLOYEE DATA**

23. Veterans Preference: 1 (1-None; 2-5 Point; 3-10 Point/Disability; 4-10 Point/Compensable; 5-10 Point/Other; 6-10 Point/Compensable/30%)
24. Tenure: 2 (0-None; 1-Permanent; 2-Conditional; 3-Indefinite)
25. Agency Use:
26. Veterans Preference for RIF: YES [ ] NO [X]
27. FEGLI: WAIVED
28. Annuitant Indicator: 9 NOT APPLICABLE
29. Pay Rate Determinant: 0
30. Retirement Plan: K FERS AND FICA
31. Service Comp Date (Leave): 11/07/80
32. Work Schedule: F FULL TIME
33. Part-Time Hours Per Biweekly Pay Period:

**POSITION DATA**

34. Position Occupied: 1 (1-Competitive Service; 2-Excepted Service; 3-SES General; 4-SES Career Reserved)
35. FLSA Category: N (E-Exempt; N-Nonexempt)
36. Appropriation Code:
37. Bargaining Unit Status: 0634
38. Duty Station Code: 30-0180-093
39. Duty Station (City - County - State or Overseas Location): BUTTE SILVER BOW MT

40. AGENCY DATA | 41. | 42. | 43. | 44.

45. Remarks
SELECTED FROM DATED

46. Employing Department or Agency: DEPARTMENT OF AGRICULTURE
47. Agency Code: AG 11
48. Personnel Office ID: 5027
49. Approval Date: 02/28/99
50. Signature/Authentication and Title of Approving Official: DONNA D BEECHER, DIR, OFF HUMAN RESOURCES MGMT

3-Part 50-315
Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

AG 110102000004000000 PP 12 1*1999*BATCH 50275519 000-00 201-04 AG/FO 11-5027

# CCP Profile History

**Lange, Kim** *Series* 0802 *Unit* 0102

## Current Certifications

| Current Certifications | Expires |
|---|---|
| 01 Roads | 5/1/2006 |
| 02 TS Inspector | 5/1/2006 |
| 03 PW Inspector | 5/1/2006 |
| 04 Aggregate Base | 5/1/2006 |
| 10 Asphalt Surface Treatment | 5/1/2006 |
| 13 TS ER | 5/1/2006 |
| 14 PW COR | 5/1/2006 |

| Examination History | Type | Grade | Date |
|---|---|---|---|
| 01 Roads | Written | P | 5/31/1993 |
| 02 TS Inspector | Basic Oral | P | 5/31/1993 |
| | Written | P | 5/31/1993 |
| 03 PW Inspector | Written | P | 5/31/1993 |
| | Basic Oral | P | 5/31/1993 |
| 04 Aggregate Base | Written | P | 5/31/1996 |
| 05 Concrete | Written | NP | 5/31/1999 |
| 10 Asphalt Surface | Written | P | 5/31/1997 |
| 13 TS Engr Rep | Written | P | 5/31/1999 |
| | Adv Oral | P | 5/31/1999 |
| 14 PW COR | Adv Oral | P | 5/31/1997 |
| | Written | P | 5/31/1997 |

| Certification History | Decertified | Date |
|---|---|---|
| 01 Roads | | 5/1/1993 |
| | | 4/11/2003 |
| 02 TS Inspector | | 5/1/1993 |
| | | 4/11/2003 |
| 03 PW Inspector | | 5/1/1993 |
| | | 4/11/2003 |
| 04 Aggregate Base | | 5/1/1996 |
| | | 4/11/2003 |
| 10 Asphalt Surface Treatment | | 5/1/1997 |
| | | 4/11/2003 |
| 13 TS ER | | 5/1/1999 |
| | | 4/11/2003 |
| 14 PW COR | | 5/1/1997 |
| | | 4/11/2003 |

| Unit History | Date |
|---|---|
| 01 02 Beaverhead-Deerlodge National Forest | |

*Comments*

United States Department of Agriculture | Forest Service | Helena National Forest | 2880 Skyway Drive
Helena, MT 59601
406-449-5201

**File Code:** 6320 **Date:** July 17, 1998
**Route To:**

BEAVERHEAD - DEERLODGE NATIONAL FOREST
Butte ... Annex
JUL 21 1998
RECEIVED

**Subject:** Abandoned Mine Reclamation

**To:** Arrowhead Reclamation
Attn: Troy Smith
43 Mayflower Road
Whitehall, MT 59759

This letter serves as notice that you have been awarded a contract in the amount of $2400.00, for the reclamation of abandoned mine shafts and adits in the Homestake-Coyote Flats are of the Jefferson RD, Beaverhead-Deerodge NF. The specifications discussed by yourself and Joslyn Dodge are attachedand hereby made a part of this contract.

As we discussed yesterday, Davis-Bacon wages apply, and the applicable wage determination is attached. Payroll records are required to be submitted when the project is completed. Copies of the form are enclosed for your use.

Kim Lange will be the COR on this project , with Jocelyn the on-site inspector.

All work must be completed by September 30, 1998. Upon completion, and acceptance of the work by the Forest Service, I will issue a check for payment. To process payment, I will need an invoice, along with the attached certification form, and your payroll records mailed to me at the Helena National Forest, Attn: Laurie Hamers, 2880 Skyway Drive Helena MT 59601.

Thank you for working with us on this project. If you have any questions you can contact me at 406-449-5201 X 206.

Laurie A. Hamers

LAURIE A. HAMERS
Contracting Officer

Enclosure

cc: Jocelyn Dodge, Butte RD, B-D NF
Kim Lange, Butte RD, B-D NF

FS-R1-6320-27 (1/92)

| | | |
|---|---|---|
| USDA - Forest Service<br><br>**DESIGNATION OF**<br>**CONTRACTING OFFICER'S REPRESENTATIVE (COR)**<br>*(REF. FSH 6309.11 and FSH 6309.32)* | CONTRACT NO.<br>43-03H6-8-0084 | FILE CODE<br>6320 |
| | UNIT B-D NATIONAL FOREST | |
| TO:<br><br>KIM LANGE | PROJECT<br>MINE RECLAMATION<br><br>CONTRACTOR<br>HYDROMETRICS INC | |

This is your designation as Contracting Officer's Representative to administer the above contract. Your major duties and responsibilities are contained in the Handbook of Contract Administration. You are delegated full authority under the contract except for the following actions which are reserved for the Contracting Officer:

1. Issue a Notice to Proceed to the Contractor.
2. Approve Change Orders and Amendments.
3. Take action to terminate the contract for default or Government convenience.
4. Make contract adjustments under the Differing Site Conditions clause.
5. Grant extensions of contract time.
6. Approve Assignment of Claims.
7. Make final decisions under the Disputes clause.
8. Make final acceptance under the contract.
9. Make final decisions under the Suspension of Work clause.
10. Make equitable adjustments.
11. Authorize change in amount of Payment Retention.
12. Approve subcontractors.
13. Approve final payments.
14. Approve use and possession prior to completion.
15. Enforce the warranty provisions.

for HAystack Adit - LaBelle Gulch Shaft - XL Heights Shaft.

| CONTRACTING OFFICER'S NAME (Print or Type) | SIGNATURE | DATE |
|---|---|---|
| LAURIE A. HAMERS | Laurie A. Hamers | 9-28-98 |

CC: CONTRACTOR, FOREST, TECHNICAL AND DIVISION, CONTRACT FILES, B & F.

ENCLOSURE # 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

TERESA KIM LANGE,

Plaintiff,

vs. CAUSE NO. CV-03-61-BU-RFC

ANN M. VENEMAN, SECRETARY, UNITED STATES DEPARTMENT OF AGRICULTURE,

Defendant.

DEPOSITION OF TERESA KIM LANGE

Taken at:
CORETTE POHLMAN & KEBE
129 WEST PARK STREET
BUTTE, MONTANA
APRIL 26, 2004
9:09 A.M.

CHRISTINE D. LIVELY
REGISTERED PROFESSIONAL REPORTER
WAYRYNEN & LIVELY REPORTING SERVICE
1940 DEWEY BOULEVARD
BUTTE, MONTANA 59701





APPEARANCES

FOR THE PLAINTIFF:

GREGORY C. BLACK
ATTORNEY AT LAW
CORETTE POHLMAN & KEBE
129 WEST PARK STREET
BUTTE, MONTANA 59701

FOR THE DEFENDANT:

TIMOTHY J. CAVAN
ASSISTANT U.S. ATTORNEY
U.S. ATTORNEY'S OFFICE
P. O. BOX 1478
BILLINGS, MONTANA 59101

ALSO PRESENT: CAROL A. KITTSON





CONTENTS

TERESA KIM LANGE:

Examination by Mr. Cavan................ 4

CORRECTION SHEET.............................. 109
DEPONENT'S CERTIFICATE........................ 110
COURT REPORTER'S CERTIFICATE.................. 111

INDEX TO EXHIBITS



| NO. | | FIRST REFERENCED |
|---|---|---|
| 1 | Documents concerning grievance.......... | 59 |
| 2 | Message from Lorrie Ghormley to Kim Lange dated October 24, 2000.................. | 61 |
| 3 | Notification to Dick Judge from Kim Lange of intention to file grievance, dated November 21, 2000...................... | 62 |
| 4 | Part I and Part II of grievance, dated December 20, 2000....................... | 62 |
| 5 | Letter to Cathy Frey and Kim Lange from Richard L. Judge, dated January 18, 2001.................................. | 63 |
| 6 | December 11, 2000 letter from Janette Kaiser to Kim Lange, Subject: Grievance, Step 2................................ | 66 |







BE IT REMEMBERED THAT, the deposition of TERESA KIM LANGE was taken at the time and place and with the appearances of counsel hereinbefore noted, before Christine D. Lively, a Notary Public for the State of Montana.

The following proceedings were had:

TERESA KIM LANGE,

a witness, after having been first duly sworn, testified upon her oath as follows:

EXAMINATION

BY MR. CAVAN:

Q. Would you please state your full name for the record.
A. Teresa Kim Lange.
Q. And what do you go by?
A. Kim.
Q. Is it okay if I call you Kim here this morning?
A. Yes, please do.
Q. Kim, have you ever had your deposition taken before?
A. Years and years ago, I had a deposition taken.
Q. So you're somewhat familiar with the procedure that we're going to go through here this morning?
A. Somewhat, yes.
Q. I imagine that you've also had the opportunity to

speak with Mr. Black about the procedure that we're going to go through this morning?
A. Yes.
Q. There's just a couple things I would like to remind you of before we start. The most important thing that we can do today is, of course, communicate very clearly with each other. And I'll try to keep my questions as clear and concise as I can, but I'm not often able to do that. So if at any time I ask you any question that's at all unclear, you don't understand something I've said, please ask me to clarify it and I would be happy to do that, okay?
A. Okay.
Q. Where were you born?
A. In Missoula, Montana.
Q. And were you raised in that area as well?
A. Yes, I was raised around Western Montana.
Q. Okay. Why don't you give me a brief history, then, of your educational background?
A. Graduated from Superior High School, went to university in Missoula for about a year and a half.
Q. What did you study at the university?
A. Speech pathology.
Q. And have you had any formal education after that time?





A. No.
Q. What year did you graduate from Superior High School?
A. 1974.
Q. Why don't you give me, then, kind of a background of your work history since you left the university. Did you go to the university right after high school?
A. Yes.
Q. You were there for a year and a half?
A. Um-hum.
Q. Why don't you give me a brief background, then, of your work history since that time.
A. In '74, I worked -- I contracted with the Forest Service to clean campgrounds and then got picked up by a firm in -- the Forest Service in Idaho to do traffic surveillance, and then got picked up back in Superior on the survey crew and worked there until we moved to Butte, which was 1979. Then I worked in a local store that winter and got on with the Forest Service here in 1980 and have worked for the Forest Service since then.
Q. Okay. One thing I should have mentioned also is the court reporter has a difficult time taking down nonverbal responses like shrugs of the shoulders and nods of the head. She has also a difficult time taking down um-ums and uh-huhs and we speak like that all the





time and we speak with our hands and our shoulders and nod all the time so just bear in mind that you have to answer all of my questions verbally and with a yes or no or whatever the appropriate.
A. Okay.
Q. The other thing I should have mentioned, it's difficult for the court reporter to take down our conversation when both of us are talking at the same time. I talk kind of slow so a lot of time, people tend to finish my questions for me, so please try to wait until I'm done with my question before you answer, and I'll make sure that you're done with your answer before I ask the next question.
If I inadvertently cut you off, please let me know that and I'll allow you to finish your question -- your answer, okay?
A. Okay.
Q. Getting back then to your work history, it sounds then, it's primarily been involved with the U.S. Forest Service?
A. Yes.
Q. And at least since 1980 or thereabouts on a permanent basis?
A. It was seasonally--
Q. Okay.





A. --when I had the survey crews.
Q. All right. And how long did you work on the survey crews?
A. I would say into the '90s, early '90s.
Q. And what type of seasonal work would that be? Would that be primarily during the construction season or would it be all in all non-winter months or what would your season be?
A. Pretty much non-winter. I mean, we did work in the cold if we had a job to finish up.
Q. All right. But you were generally laid off for some months during the wintertime?
A. Yes, usually three or so.
Q. What kind of work would you do on these survey crews?
A. I was the party chief so I had the responsibility of the crew. We went out and surveyed the line for road construction generally on recreation or timber sale. We were responsible for collecting the information and then putting it in a format that could be used in the office.
Q. For construction projects in the forest?
A. To design the project, yes.
Q. And how long then were you a party chief on the survey crews?
A. Let's see, I started in -- I think it was in 1980

until probably early '90s.
Q. Did you have any formal training or education in survey or was it more on-the-job training?
A. It was on-the-job training.
Q. Did they send you to any particular schools or training or was it just going out with the survey crews and learning the skills of the trade?
A. There was some training but it was generally on how to use a piece of equipment, or there wasn't much training, it was more on-the-job.
Q. What, from the early '80s then to the early '90s, what was your grade?
A. I think when I came here, I had either a GS-4 or a GS-5 and then worked my way up to a GS-7.
Q. Were you a GS-7 while you were still in survey?
A. Yes.
Q. When did you -- at some point in time, did you leave the survey position?
A. Yes, I became more of an office job.
Q. Okay. And when did that occur?
A. I would have to look at my--
Q. I'll help you out.
A. --my personnel history.
Q. And see if this sounds about right. In June of 1991, you applied for and became a civil engineering





technician?
A. Okay, yes.
Q. Would that be about right?
A. (Witness indicates yes.)
Q. And that is different from the surveying technician?
A. Yes.
Q. Why don't you tell me then what a civil engineering technician does?
A. We were responsible for actually doing the road design or the project design, putting a contract together. It was just more technical aspects of the job.
Q. Okay. So you would get the survey from the survey crew and you would actually design the road in the forest?
A. Right.
Q. And then you would put together a contract to build the road?
A. Yes, I helped with those duties.
Q. And those are the duties of the civil engineering technician?
A. That and other. I would have to read the PD again but--
Q. And I understand that but just -- I'm just trying





to get a general feel from you of what you feel that the duties and responsibilities of a civil engineering technician are and maybe you can cover those a little more in depth.
A. Well, it would depend on what grade level you are but--
Q. Okay. At the time you became a civil engineering technician, you were a GS-7?
A. I believe when I applied for that job, I got it at a 7 level.
Q. Then why don't you tell me what the duties and responsibilities are that you performed as a GS-7 as a civil engineering technician.
A. Well, the ones I mentioned before.
Q. Okay.
A. And I went out on the projects with my boss at the time, George Nolte, or the line above him was Rich Hollamon.
Q. Okay. And would do what, when you would go out on the jobs?
A. They were kind of showing me the duties of inspection.
Q. Okay. And what is the -- what are the duties of inspection?
A. They're on a delegated form. Basically, they're





to make sure that the contractor is adhering to the specifications of the contract.
Q. All right. Is that a separate designation from the civil engineering technician to become an inspector or is that included within that position?
A. Not all -- I wouldn't say all civil engineering technicians become inspectors.
Q. Did you have to pass some type of a certification to become an inspector?
A. Yes.
Q. And what's that called?
A. It's called -- well, it's an inspector certification.
Q. And did you become inspector certified?
A. Yes, I did.
Q. And when was that?
A. Nineteen -- let's see, I would have to look at some records.
Q. And that's fine. And maybe you can clarify something for me. I read a lot about the COR certification, and is an inspector different from the COR certification?
A. Yes, it is.
Q. From the records I have, it appears that you became COR certified about in May of 1997. Does that

sound about right?
A. It sounds right.
Q. All right. And then -- but at sometime prior to that, you had become inspector certified?
A. Yes.
Q. And do you have any idea of how long before that you were inspector certified?
A. I would say three or four years probably.
Q. All right. What type of a procedure did you have to go through to become inspector certified?
A. You get a workbook and you work through the problems in the workbook. And then you take a written test. It's a four-hour test. And if you pass that test, then you go to an orals board and the oral board then determines whether they want to certify you or not.
Q. And this is for inspector?
A. Right.
Q. Is this something that you desired to do, did you want to become an inspector or was this something that was required of you for this position?
A. I was told what tests to take. I just -- I assumed it was part of the job.
Q. Okay. So getting back to my question, I guess, was it something that, a certification that you desired to attain or was this something that you were directed





to do?
A. I was directed to do it.
Q. And we'll just use, say, the 1993 or 1994 or thereabouts, when you became an inspector, did that involve then a large part of your duties?
A. Yes, especially during the construction season.
Q. So you would, in your job as a civil engineering technician, would do road design?
A. Right.
Q. You would put together the contracts for the road construction project?
A. Yes, I helped do that.
Q. And would you do that in conjunction with somebody else?
A. Yes.
Q. And who would that be?
A. Usually, the office, George Nolte, Rich Hollamon, whoever happened to be working on that project.
Q. I see. So you alone wouldn't be responsible for the project, a superior in your office would be responsible for the project?
A. Right.
Q. And you would just assist that person with road design?
A. Right.





Q. And assist that person with putting together the contract?
A. Right.
Q. Under their supervision?
A. Correct.
Q. Then when the contracts that you put together in the office were in the construction phase, you were an inspector?
A. Right.
Q. And you would go out and you would look over the project and make sure that it was being built in conformance with the contract?
A. Right.
Q. All right. Any other duties that you did -- and let's take it prior to 1997, any other duties that you performed as a civil engineering technician?
A. Not that comes to mind right now. That was basically the job.
Q. All right. Did -- again, did you have any special training in the engineering field?
A. No.
Q. And all the training that you received then was on-the-job training?
A. On-the-job training, and they did send us to some classes periodically. Like we would go to, it was





usually a two- or three-day class where we talked about contracts and what an inspector or a COR's duties were, that type of thing.
Q. Let's talk about the COR certification for a little bit. As I understand, that stands for Contracting Officer's Representative?
A. Correct.
Q. Why don't you explain that to me a little bit, what the duties and responsibilities of the COR are?
A. Once again, those are spelled out on the designation form. It's a little more duties than what the inspector has. The COR is responsible for issuing stop work orders if there happens to be a safety issue on the job.
They work through change orders, money situations, and then take that information to the CO, who is the deciding official on it. But the COR is the on-the-ground liaison.
Q. I see. So the hierarchy then, there would be an OR, or a CO?
A. A CO.
Q. Which would be the contracting officer?
A. Correct.
Q. And then there would be the COR who would be the next in line?

A. Correct.
Q. And then there would be the inspector who would be below the COR?
A. Correct.
Q. Now, from my records anyway, it appears that you became again certified COR in May of 1997, and that sounds about right?
A. Yes.
Q. Again, explain -- prior to '97, how many COR certified people were there in this forest, the Beaverhead-Deerlodge Forest that you know of?
A. Kathy Smith. I don't know if Jim Mickelson was here in '97 or not, but he was certified. Dick Judge. Let's see, Rich Hollamon was still here in '97, I believe. That's all I can think of off the top of my head.
Q. Were you stationed in Butte?
A. Yes.
Q. Who all was in the Butte office?
A. In 1997?
Q. Right. Let's take it from '91 when you became the civil engineering technician up to '97 when you became the COR.
A. We went through a downsizing period, so the office early on had more engineering people than it did in the





latter part of that time period.
Q. Okay. And I'll visit with you about that in a little bit here. Give me a rough idea in the early '90s, then, how many people you had in engineering here in Butte and then how many you had in '97?
A. Let's see, we had Ed Kelly, Tim Johnson, George Nolte, Rich Hollamon, Norm Ward, Lloyd Laughery, myself, Betsy Follman, Dawn Clark. I think that was on our end of the forest, when we were still the Deerlodge, which would have been that early period.
Q. And then as I understand it, sometime in the mid-'90s, the two forests, Deerlodge and the Beaverhead Forest moved, consolidated?
A. Yes.
Q. Were there more engineering folks here in Butte after the merger in the mid-'90s?
A. Can you rephrase the question? I don't understand the question.
Q. Okay. And it was a bad question. You named off the people I understand that were in the office in the early '90s.
A. Right.
Q. And then in the mid-'90s, there was a merger between the two forests; is that correct?
A. Right.





Q. Were there more engineering people after the consolidation here in Butte?
A. No.
Q. Did that start then the reduction in force here in the Forest Service in Butte in the engineering department?
A. It actually started before the combination.
Q. Okay. Why don't you tell me then in '97, who was here in the engineering department?
A. Randy Scott, myself, Rich Hollamon, the road crew fellows. That would have been Bill Rauch and probably three or four part-time or seasonal folks.
Q. And you recall the people in this office or in this area that were COR certified in '97 were Miss Smith?
A. No, Kathy works on the Dillon end.
Q. Okay, she's in Dillon. Dick Judge is also in Dillon; is that correct?
A. Right.
Q. And then Mr. Hollamon, was he in Butte?
A. Yes.
Q. Now, explain the procedure to me for becoming COR certified.
A. Once again, you take a four-hour written exam and you sit before an orals panel.





Q. And is there some type of training that you do in advance of the exam?
A. You have a study guide.
Q. How extensive is that?
A. The study guides?
Q. (Indicates yes.)
A. For the roads and the specialized fields that you can get certified in such as aggregates, surfacing, wastewater, buildings, they're pretty intense and use a lot of formulas for quantities and that type of issues.
Q. Now, I guess I didn't realize that you apparently can become certified in different areas?
A. You get specialized subcategories.
Q. I see.
A. You become certified as a public works inspector or a public works COR and a timber sales inspector or timber sales ER, they call them, engineering rep. The other categories, you have to be certified in those in order to take the other categories and those are just specialized fields.
Q. I see. So you became just certified as a public works COR in '97?
A. I believe so, yes.
Q. And then did you become specialized in any area after that?

A. I can't remember exactly when I took the courses but I have aggregate base and surface course I'm certified in.
Q. These are subcategories of certification?
A. Yeah, I think I'm certified in two or three subcategories.
Q. Why don't you explain to me aggregate base and surface categories.
A. Okay, the aggregate base is when you want to put a base on the road. Instead of having the native surface, you want to harden that a bit with gravel.
Q. Okay. And the base certification?
A. The base -- I'm not sure I'm saying these right, but I also got certified in the asphalt.
Q. Would that be the surface?
A. Right.
Q. So--
A. It could be called asphalt. I mean, I can't remember the subcategory.
Q. So there was the base category which was laying down a non-native surface and then the final surfacing of the road also is a different category?
A. Yes.
Q. How much study is involved to become COR certified as a public works COR?





A. Quite a bit of study. And also to be -- when you first are becoming inspector certified, you have to pass the public works, but you also have to pass one of the specialized fields. And then when you're in engineering, that specialized field is called roads. That's an extremely difficult course. It's very technical, math oriented.
Q. How long did it take you to study for the roads and the COR public works exam? When did you start studying for it and when did you take the exam?
A. They probably gave, I would say four to six week's time frame that they would let me study. You know, you might study a couple hours a week at work. Generally, most of us took it home to study at home.
Q. So they would give you some materials to study four to six weeks in advance of the exam?
A. Yes.
Q. And you do it a couple of hours at work?
A. I would say that's probably an average.
Q. A couple hours per what at work?
A. I would say per week.
Q. And were you allotted time to do that at work?
A. Yes.
Q. Were you free to take whatever time you wanted at work to study for the exam?





A. I wouldn't say you were free to take whatever time you need or wanted. If you had questions, the supervisor would be there to answer them. You still had your normal workload so it wasn't like you could take an abnormal amount of time to study.
Q. Were there any restrictions placed upon the amount of time that you could devote to study while at work?
A. I didn't have any restrictions placed on me. I have heard of other people who have been told they need to do both.
Q. How much time did you spend outside the workplace studying for this exam?
A. Several hours. I mean--
Q. And I know this is difficult, we're talking about several years ago, but can you give me some idea in that four- to six-week period how much time you devoted outside of the workplace to study for the exam? Was it a couple hours a week?
A. I would say it was probably -- I usually did it on the weekends, usually eight hours a week maybe.
Q. You took the exam, you passed it, and in '97, that would have been the public works and the roads?
A. Correct.
Q. Now, again, was the COR certification something that you wanted to attain or was this something that you





were directed to do?
A. I was directed to do it.
Q. You didn't express any interest in doing that prior to that time?
A. Not to my knowledge.
Q. And did it benefit you in any way in your job to be able to do that or for opportunities of advancement in your job to be COR certified?
A. I thought it would.
Q. Explain that to me.
A. It's a higher graded position and so my assumption was that once I attained it, I would be paid at that grade level.
Q. Was this COR training or the COR responsibility something that you did not want?
A. I wouldn't say I didn't want them. They added a level of stress to the job because you're interacting with the contractor. But I wouldn't say it was something that I -- I didn't refuse it.
Q. Is that something that you could have done or do you know?
A. I didn't know that I could have done that. I found that out later.
Q. Now, at the conclusion of becoming COR certified, you said that you thought that would lead to some sort

of a promotion?
A. Yes.
Q. You were at a GS-7 at the time?
A. Yes.
Q. And what did you think would result from becoming COR certified?
A. The COR duties are in the GS-9 Position Description, so that's what my assumption was.
Q. Did you expect that promotion to become automatic upon completion of your COR training?
A. I didn't know how management would handle it. Myself and some other folks that were taking the training at the time, we just assumed that if they were working us in that capacity, they would pay us.
Q. Did you have any discussions with management about that prior to becoming certified?
A. No.
Q. Were any representations made to you that that would in fact happen if you became COR certified?
A. Other than the people who I knew that were GS-9s were certified in that arena, I never had anybody sit down and discuss that with me.
Q. But it would at least make you eligible to be promoted to that GS-9 position, if you became COR certified?





A. I believe so.
Q. If you were not COR certified, would you have been eligible for a promotion to a GS-9?
A. I have heard, in doing some studies after I got involved in this, that there are some people who are at the 9 level and are inspectors, they are not certified. Just looking at the PD, I wouldn't have assumed that, but that is the case.
Q. In looking at the -- and the PD is the Position Description; is that correct?
A. Correct.
Q. In looking at the Position Description for a GS-9, it appears to require the COR certification?
A. Yes.
Q. And so at the time, it was your understanding anyway at the time, that you would have to obtain the COR certification in order to reach that next level?
A. I think if you stayed in the contracting realm, the administration of the contracts, yes.
Q. After you became COR certified in '97, were you given COR assignments?
A. Yes.
Q. And did you want those assignments, did you request those assignments, or were they just simply assigned to you?





A. They're assigned.
Q. Was it something that you welcomed or something that you resisted?
A. I did not resist. That was a duty that was assigned to me.
Q. And did you like that new duty and responsibility? Was that something that you wanted, that you enjoyed or was it something that you did not want?
A. It added a level of stress to the job. I wouldn't say I didn't want it but it added a level of stress.
Q. What assignments were you given?
A. I had some mining reclamation assignments and I had a road decommissioning assignment.
Q. Let's take them one at a time. There is some mining reclamation assignments. And again, maybe I could help you out a little bit. I know this was a long time ago. According to the records I've been given, there was a Homestake Coyote Flats mine reclamation project?
A. Correct.
Q. And that was in July of '98?
A. I believe so.
Q. Would that have been the first COR assignment that you received?
A. I don't know if that was the first one or if





LaBelle Gulch. I'm not sure.
Q. Tell me first, then, about the Homestake one, what was that all about? What kind of a project was it?
A. I believe it was, you know, there was an existing mine hole out there that we needed to fill in for public safety.
Q. And who assigned you as COR on that project?
A. I believe Laurie Hamers did. I would have to look at my designation.
Q. That's kind of a new name for me, Laurie Hamers.
A. Right.
Q. Can you spell that?
A. Spell it?
Q. Spell the last name.
A. H-A-M-E-R-S, I think.
Q. All right. Where was she at?
A. She wasn't from the B Bar D. I believe at that time, Laurie was on the Helena, I think, but the CO aspect of the job was kind of spread. We worked for her, we worked for Bill Pfeifer who was in Bozeman. And then we worked for the CO that was in Beaverhead-Deerlodge.
Q. And can you give me some idea of the complexity of that particular project?
A. It wasn't a real complex project. It was

basically making sure that the hole was filled in and in a safe manner.
Q. Are there different levels of complexity involved in COR duties?
A. There's different levels in the contract itself. You know, you'll have a multi-million dollar contract. Usually, that's in a higher, like defense or somewhere like that. So it depends on the work required, the complexity of the job.
Q. So there's some COR assignments, I imagine, that would be relatively simple?
A. Correct.
Q. And some within your office that would be very complex?
A. Right.
Q. And would you classify this Homestake Coyote Flats project as a relatively simple project?
A. Yes.
Q. And do you know how much time you devoted to those COR duties on that project?
A. I had an inspector that worked for me on that. I don't -- I couldn't tell you how many hours the project took.
Q. You're talking to somebody that can't do much math, much less engineering, and so I'm trying to get--





MR. BLACK: Do you want a calculator?
Q. (By Mr. Cavan) I'm just trying to get some idea of how much time and effort these projects require. And so when you have a relatively simple mining reclamation project like this, are we talking that this may be something you wold devote 40 hours to, would it be something that you would devote several weeks to? Give me a broad generalization like that, if you can.
A. On a simple fill in a hole type thing, sometimes the contractor could get out there and get it done in a day or two. There's the aspects of the before you actually get on the ground with the contractor that takes some time and then whatever time it takes for the contractor to get the job done.
Q. Okay.
A. The simple ones could have lasted a few days.
Q. All right. Okay. Tell me about the next one that you can recall that you were assigned to.
A. There was -- I think there was one called the Fire Line something, and I would have to look at my folders.
Q. All right. I have a note that you worked on one called the Haystack Adit Reclamation Project. Do you know what that would be?
A. There were several -- I think there was three actual sites on the one contract.





Q. For which one?
A. I think it was Haystack.
Q. How about Haystack, LaBelle Gulch--
A. Right.
Q. --Heights Shaft, was that all one project?
A. Yeah, it was one contract. The projects were located in different spots.
Q. And this was another mining reclamation project?
A. Yes.
Q. And that would have been in September of '98. Does that sound about right?
A. I believe so. I would have to look at my folder.
Q. And what were the nature of those particular projects?
A. Those were similar. There were holes, mining shafts out there that were created, and it was public safety. I think we fenced one to keep the public out of it, took down structures that were -- wooden structures that could fail and fall on people so--
Q. And other than that, fill in the hole on the projects?
A. Right.
Q. Again, would you classify this as a relatively simple project?
A. Yes.





Q. When -- who assigned you to that particular project, do you remember?
A. I think that was Laurie I believe.
Q. Laurie?
A. Hamers.
Q. Okay. Another one I have that you worked on was the LaMarche Poly Road Contract?
A. Right.
Q. And that was in September of 2000, a couple years later?
A. I believe so.
Q. And who assigned you to that?
A. I believe it was Mike Blinn.
Q. Mike Blinn. And where is Mike from?
A. He works out of the Dillon office.
Q. And what was the nature of that project?
A. It had been -- there had been a timber sale up there and a road was constructed to that sale. Part of the road was put in, probably in error. It went across a wet area. We wanted to decommission that road.
And the wet area was particularly emphasized, in that we didn't want to add any more sediment to the creek. There was fish issues.
Q. So how much road are you rerouting here? Is that what you did?

A. No, we didn't reroute. We just decommissioned, which is actually pulling the roadbed up, reseeding.
Q. I see. So it's taking the whole road out?
A. Right.
Q. And how much road are we talking about?
A. I would have to look at the contract. I don't remember what the--
Q. Approximately.
A. A mile. I don't remember exact footage.
Q. In September of 2000, do you recall what your position was in the office here at that time?
A. I was a civil engineering tech.
Q. And the reason I ask you, at some point in time, did you fill in for Diane Johnston, when she was out of the office?
A. Yes.
Q. And you were temporarily promoted to a higher position?
A. Yes.
Q. Do you remember when that was?
A. It was the fall of 2000.
Q. Would it have been at the same time then as this LaMarche Poly Road Project?
A. I believe that project was done earlier in the summer but I couldn't swear to that.





Q. And I guess the records of when that project was let or when you worked on it and when Diane Johnston was gone would verify that?
A. Correct.
Q. Okay. What would you describe as the complexity on that project? How would you rate that one?
A. It was more complex than the closing of the mine.
Q. Still relatively non-complex?
A. Yeah, I would say that.
Q. I have a gap then between September of '98 and September of 2000 for COR assignments. Do you recall any other assignments during that period from September of '98 for the LaMarche project in September of 2000?
A. I would have to look. I had a chronological order, and I'm sure it's in some of this paperwork of the projects that I had done. I would have to look at that.
Q. Do you recall how many others you were assigned to, other than those three?
A. No, I'm sorry, I would have to look.
(Whereupon, a brief discussion was held off the record.)
Q. (By Mr. Cavan) In any event, you put together some type of a list of all the COR assignments that were given to you between '97 and the time that your COR





duties were removed?
A. Yes, I did.
Q. But you don't recall how many were on that particular list?
A. No.
(Whereupon, a brief discussion was held off the record.)
Q. (By Mr. Cavan) We've had some discussion off the record and we're looking for this list that was developed at some time. But you do have one document in front of you that apparently has another job?
A. Yeah, in 1999, I was COR on the South Deerlodge CMP Road Obliteration project, which I think I mistakenly told you was the LaBelle Gulch, or the LaMarche Poly Road Obliteration dealing with the culvert that was -- had to be taken out.
Q. Okay.
A. The fish issues.
Q. So in '99, okay, that's the South Deerlodge CMP and Road Obliteration Project?
A. Correct.
Q. And that's the one we just talked about where you took the road out. And then in 2000, you were assigned the LaMarche Poly Road Obliteration Project and that was yet again another road obliteration?





A. Correct.
Q. And of the same type as the South Deerlodge project?
A. Yes, I believe this one had -- was a longer footage-wise project but it's similar, yes.
Q. And again, relatively non-complex?
A. I would categorize it as that.
Q. Any others that you can recall then after 2000?
A. Not that I can recall unless I could see that list.
Q. So from what we can recall today anyway, you had the two projects in 1998, the mining reclamation projects, right?
A. Correct.
Q. Then you had the road project in 1999?
A. Correct.
Q. Then another road obliteration project in 2000?
A. Correct.
Q. And that's all you can recall at the present time as far as COR assignments are concerned?
MR. BLACK: Well, for the record, I'm going to object that the official records of the Forest Service should reflect these particular jobs and they would be the best evidence of what she performed, not her recollection years after the fact.

THE WITNESS: I would have to have that list.
Q. (By Mr. Cavan) Okay. But as you sit here today, you don't recall any others?
A. When D.J. was gone, I had some COR duties on her projects but I would have to look at the list. I can't recall them.
Q. Can you give us some estimate of how much time was spent on these COR duties versus your other duties as a civil engineering technician?
A. When the contract's actually ongoing, probably 80 percent of the time was spent administering it. You have to be out there on the ground watching what's going on.
Q. And at other times, would be none, I would assume?
A. If the contractor isn't out there on the ground?
Q. Right.
A. You have some office issues that you work with, but it's not 80 percent of the time.
Q. Okay. What issues do you deal with as a COR when you're not out there on the construction site?
A. Oftentimes, the contract requires certain items to be provided by the contractor and they send you in a list of what they're providing and you have to go through and make sure that those items are compatible with what the specs specify.





Q. And how much time would be devoted to something like that?
A. It would depend on the contract. I couldn't tell you.
Q. Let's just take them one at a time then and go back to the first mine reclamation project that we recall, the Homestake Coyote Flats project. And I may have asked you this before, but how much time was devoted to that project as COR?
A. This is a rough guess because I don't have my folder in front of me.
Q. Sure.
A. I think it was a fairly short project. I would say a few days.
Q. Okay. The next mine reclamation project you had was the Haystack, LaBelle Gulch, et cetera. How much time was devoted as COR to that project?
A. Each one of those Adits probably took two or three days, so between the three of them, I would say a week, week and a half.
Q. Then in '99 with the road obliteration project, how much time was spent as COR on that project?
A. I think they were out there several weeks, maybe a month, month and a half. I don't recall the exact time frame.





Q. And did the time that they were out there, how much of that -- you wouldn't be on-site all the time, I assume, as a COR?
A. It depends. You don't always have an inspector assigned to you so if you don't have eyes out there, then you have to be out there doing it.
Q. The entire day?
A. Not the entire day. Some people did. The workload was too great for us to spend the entire day out there.
Q. In the '99 road obliteration project, did you have an inspector?
A. I don't believe I did.
Q. Would you detail in some fashion in your work records the amount of time that you spent on your COR duties on a project like that?
A. We had contract daily diaries, which would talk about the time when you arrived at the site and when you left the site. That would probably be the closest thing I could--
Q. Would they be in the contract folders?
A. Yes.
Q. Then what about the last road obliteration project that we recall here today, in 2000, do you recall how long that was?





A. That took, I would say, several weeks.
Q. And did you have an inspector on that project?
A. I think, yes, I did. I think D.J. was my inspector, I believe.
Q. And we could look at, in that file folder again, it would detail the amount of time that you spent as COR on that project?
A. It would detail the time I was out on the job, yes.
Q. And throughout this time period then from '97 to 2000, you would also be performing the other duties that you previously performed as a civil engineering technician?
A. Correct.
Q. Did you ever provide any type of a breakdown in terms of percentage of the time that you devoted to your COR duties versus the time that you devoted to your work for additional civil engineering technician duties?
A. Not that I recall.
Q. You never provided any kind of an estimate of the amount of time that you spent doing that?
A. When I was doing my Position Description, I believe they asked me to break out the time frames but I thought it was in relation to the amount of time I spent doing Engineering duties and the amount of time I spent

doing Lands duties.
Q. Oh.
A. But that's the only thing I can recall.
Q. And I would like to talk to you about that, too. Apparently, there was some division in your workload between Engineering and Lands?
A. Correct.
Q. What was the breakdown? How much time were you supposed to be devoting to each?
A. We had set about trying to come up with an equitable amount. It was very difficult because neither job stopped for the other job to start. I think we finally ended up with six months devoted to each.
Q. So roughly half and half?
A. Is what we were trying to work it out to be, yes.
Q. What were your duties in Lands?
A. Conveyance.
Q. What are Lands, first of all?
A. It's the acquisition and -- of lands, rights-of-ways.
Q. So any transactions involving Forest Service real estate?
A. Correct.
Q. Easements?
A. Correct.





Q. All that type of thing.
And what was your particular job in that?
A. I was the conveyance examiner, so I would look over the deeds to make sure what rights we were acquiring, what were outstanding rights. And then I put together the information that had to go to the regional office. There's a six-part folder with several documents that have to be included to go to the regional office and then they are the ones, OGC gives the approval, final approval of the purchase or sale or whatever we're doing.
Q. Now, you mentioned before that there's a position or certification called engineer's representative?
A. Right.
Q. Was that in connection with your duties at Lands or in connection with your duties in the Engineering Department?
A. Engineering.
Q. What is an engineering representative?
A. It's the person who oversees the contract for timber sales instead of public works.
Q. I see. So there's a COR certification for public works and then there's a separate certification that oversees contracts involving timber sales?
A. Correct.





Q. And you became engineering certified, engineering representative certified in May of '99?
A. Yes, it was after the COR so--
Q. Were you ever assigned any project as the engineering representative?
A. I think I just inspected. I don't think I had COR duties assigned to me.
Q. All right. But you did complete that particular certification?
A. Yes.
Q. Again, was that something that you sought to do or is that something that you were assigned to do?
A. I was assigned.
Q. Is it something that you did not want to do or something that you desired to do?
A. It was assigned. I just thought it was part of the job. I didn't have a feeling, you know, that I could say no or--
Q. Did that make you -- like the COR certification, did that make you eligible for a higher grade?
A. You know, the only thing in the PD that I can remember is listed as COR. I'm not sure if ER is listed in there. It's the same grade of work so I would assume an ER would put you in that same PD classification.
Q. So engineering representatives are generally





GS-9s?
A. I believe so.
Q. How many engineering representatives were there in the forest in '99 when you completed yours?
A. I believe Kathy Smith and if Rich was still there. I think Rich retired.
Q. Rich?
A. Hollamon.
Q. Hollamon.
A. In '99 I think he was. Dick Judge I assume is. I believe that was it.
Q. And after you completed the certification, you just never were assigned that duty?
A. It's very difficult to get a timber sale to the point where you actually have a contract. So yeah, not to my knowledge. I can't remember being assigned those duties.
Q. Is that also something that took a lot of time and study on your part?
A. Yes, it was -- it's approximately the same. The test is a four-hour written test.
Q. So you were given the materials four to six weeks in advance of the test?
A. Yes.
Q. Study materials?

A. Yes.
Q. Were you allotted time at work to study?
A. Yes, similar to the COR.
Q. And did you also again have to devote some time outside of work to study?
A. Yes.
Q. And about the same amount of time as COR?
A. I would say it's approximately the same.
Q. Now, after receiving your COR certification, did you feel that you were performing work above a GS-7 level?
A. Yes.
Q. And did that feeling arise on your part right after completing the COR certification?
A. I would say that probably arose when I was doing the duties.
Q. Okay. So in -- as of 1999 -- excuse me, 1998 when you got your first two COR assignments, you felt that you were doing work of a GS-9?
A. Correct. Then the forest flew a job. It's a civil engineering technician in the Minerals arena of the organization. And when they flew that job, the outreach stated--
Q. Excuse me, I don't understand the vernacular, "flew the job"?





A. When they advertised the job.
Q. Okay.
A. The outreach, which is an internal before you actually put the job on the market, they want to see the internal interest. The outreach stated that the position was a 7/9, the 9 being dependent on becoming COR certified. So the gentleman that applied for that job and got it then took the COR certification within a short period of time after he received the job and was given the GS-9. And to my knowledge, Randy didn't have any COR duties for at least the following year.
Q. Okay. Who are we talking about here?
A. Randy Scott.
Q. And when did this position become available?
A. Let's see, I believe it was in 2000.
Q. Was this after your COR duties were removed?
A. I believe it was. I believe we were in discussions at that time.
Q. We'll get to that in a little bit here. But getting back to '98 when you were doing COR work, at least the projects we talked about, did you feel that you were performing work above your grade?
A. Yes.
Q. Did you talk to anybody about that?
A. I talked to D.J., my boss.





Q. And what was your discussion?
A. D.J. agreed and she was going to take it up with line management.
Q. And this is back in '98?
A. I think we first started discussing it in '98, yes.
Q. Is there some type of a procedure that you can go through to request a reclassification of your position?
A. I think you can ask for a desk audit.
Q. What's that?
A. Someone comes in and you go through your work and then they classify that out, those duties.
Q. Did you request a desk audit?
A. No.
Q. Was that available to you?
A. I believe it's available to everybody.
Q. Did you discuss it with anyone in '98 and '99 other than with D.J.?
A. I had a meeting with the ELMO. I don't remember the date of that. Dick Judge was there, Randy, Kathy Smith, Cathy Speich, myself. I believe that's all that were there.

Randy Scott and Kathy Smith had been in the office one day and we were talking about doing these duties and not being compensated for it. And we wondered how to





bring it up to management and there was some uneasiness of bringing it up. And so I said I would do so in my union role. I felt that might protect me a bit more than bringing it up just as an employee.
Q. Now, is this before there was any type of talk of submitting these reclassifications when Ervin Brooks came on?
A. Yes.
Q. Okay. Tell me about that. So you had these conversations within your office here in Butte and you volunteered as -- to approach management about this?
A. Yes.
Q. And did you do that?
A. Yes, I did.
Q. And you had a meeting with who?
A. Jim Mickelson, Dick Judge, Cathy Speich, Kathy Smith, Randy and myself I think were in attendance.
Q. And what was discussed?
A. I brought up the fact that we were being worked outside our Position Descriptions.
Q. And specifically with the COR?
A. Correct.
Q. Okay. And what did you tell them, just that?
A. I talked about that. Jim Mickelson, I believe, brought up the fact that there wasn't any spot on the

organization chart to move people up. And I told the group that they would probably be getting requests for desk audits if the situation stayed that way.
Q. And was that -- anything else?
A. Anything else in regards to--
Q. Discussed regarding working over your grade or not being compensated for the work that you were doing or have you covered that?
A. That was what the meeting entailed.
Q. And what was their response?
A. Jim Mickelson was verbally angry. His chin shook. And Dick Judge just stated that those duties would be removed.
Q. All right. Is there -- in federal employment, is there some concern about keeping employees within their job descriptions?
A. That's a requirement, that you work your person within the job description duties. With downsizing, that's a real hard thing to maintain.
Q. Okay. So, but if it comes to a supervisor's attention that somebody is working above their grade, is it their responsibility to make sure that that doesn't happen, that they work within their grade?
A. It's their responsibility to take care of the situation. How they choose to do that is either through





accretion of duties or removal of the grade controlling duties.
Q. I've read that term a few times in going over the file. Maybe you can explain that to me, this accretion of duties?
A. Accretion of duties is just when, through time, you're doing duties outside your Position Description.
Q. And what happens then?
A. Then the management -- it gets classified. Management then decides -- has the option to decide if they want to remove those duties or if they want to accrete the person.
Q. Okay. So when you had this meeting with Mickelson and Judge prior to this reclassification and explained to them that you're working above your grade duties, Dick Judge is responsible and said, "We are going to remove those duties above your classification"?
A. Yes, I believe it was Dick.
Q. Okay. Is that something appropriate for management to do in that situation or not?
A. Management needs to look at that and abide by all the current laws that they're governed by and then they can make the decision.
Q. But if they are working around, above the grade of the employee, is it management's option then to remove





those duties that are above the grade?
A. If they do--
MR. BLACK: I'm going to object. The question has been asked and answered. But one more time.
Q. (By Mr. Cavan) Go ahead.
A. If they do it within the regulations that they're -- and the rules that are set out for them to do that.
Q. Well, what rules govern that? You're going to have to explain.
A. The Master Agreement governs it. The Merit Promotion Plan governs it, the Equal Pay Act. All that should be taken into consideration when those decisions are made.
Q. I see. Okay.
Now, after having this meeting -- and do you recall the year that this happened, that this took place?
A. I would have to look at my notes.
Q. Do you have those notes available?
MR. BLACK: Can I help?
MR. CAVAN: Sure, you bet.
MR. BLACK: February of 2000.
THE WITNESS: Okay, February of 2000.
MR. BLACK: Tim, That's referred to in the discovery responses as well.
MR. CAVAN: Okay.





MR. BLACK: I don't mean to jump in, but I think that would maybe help things out.
MR. CAVAN: That will help a lot.
Q. (By Mr. Cavan) Were you ever assigned any COR duties, to your knowledge, after February of 2000?
A. Yes.
Q. When was that? I'm sorry, let me help you out. That would be the road project in September of 2000.
A. The LaMarche Poly Road Obliteration?
Q. Right. Would that be correct?
A. I believe so.
Q. Any others that you can recall?
A. I believe I had duties in 2000 -- no, that might have been the last one.
Q. And again, do you recall if that project, the LaMarche Poly project took place while you were temporarily promoted to a GS-9 while Miss Johnston was away from her station here?
A. I believe it happened earlier in the summer.
Q. Did you have any other discussion with management, other than your discussions with Miss Johnston and this meeting that took place in February of 2000 about the fact that you were performing work above your grade?
A. Not that I recall.
Q. Now, as I understand it, then, there was some type

of a reclassification process that happened in about June of 2000?
A. Reclassification?
Q. Well, just to move things along, I'll tell you my understanding and then you can either correct me or explain what actually occurred. You had a new superior of some type come on by the name of Ervin Brooks?
A. Correct.
MR. BLACK: In 2000?
MR. CAVAN: Well, he was here in 2000 anyway; is that right?
THE WITNESS: I believe he was here, yes.
MR. BLACK: The question was, did he come in 2000?
MR. CAVAN: No -- actually, as I understand it, he came on board at some point in time and requested that reclassifications be submitted by all employees.
THE WITNESS: Correct.
Q. (By Mr. Cavan) And so he invited anybody that thought they were working above their grade to submit reclassifications?
A. Correct.
Q. And you submitted one?
A. Yes.
Q. And that was submitted, according to my notes





anyway, in June of 2000?
A. I believe so.
Q. And this was in response to his request?
A. It was in response to D.J. having taken the issue to him. And then he said anybody that feels they're not working within their PD, 80 percent accuracy, should submit.
Q. And tell me your understanding about how that all transpired between D.J. and Mr. Brooks.
A. After our discussions with D.J. and actually, I think D.J., when she was working with us, brought it up, that she felt Randy and I were both working above our current Position Descriptions and that she was taking that to Ervin Brooks and discussing that issue with him.
Q. And she did that?
A. Yes, she did.
Q. And in response to that, he invited reclassification?
A. That was my understanding.
Q. In any event, you did?
A. Right.
Q. And you prepared a Position Description of the duties that you were performing?
A. Correct.
Q. How did you go about doing that?





A. Sat down with existing PDs, took what my workload was, incorporated that. I then took it to D.J., had D.J.'s input on it. And I took it to my supervisor in the Lands arena and had their input on it.
Q. So you sat down with the existing Position Descriptions and I assume that would be for the description for a GS-7 and a GS-9?
A. Correct.
Q. And you used portions of the existing description for the GS-9 to draft yours?
A. Correct.
Q. And then you took that Position Description that you prepared and took it to D.J.?
A. Correct.
Q. Did she take it to anyone else within Engineering or was she the person that signed off on that?
A. I -- to my knowledge, she didn't take it to anyone else.
Q. Did she sign off on it in some fashion? I'm not sure how these things are submitted. When you take it to her, does she have to say -- sign something that says yeah, I've reviewed this and yeah, it's accurate and this is what we would like you to review?
A. I don't believe D.J. did that. I think to actually get it reviewed, Ervin had to send in a request





I believe. I'm not really sure on that.
Q. Did Ervin review your Position Description to see if it was accurate or was that D.J.'s responsibility to your understanding?
A. To my understanding, it was D.J's responsibility.
Q. In any event, it was sent in?
A. Correct.
Q. And there was some, as I understand it, delay in responding to the request for reclassification?
A. The Master Agreement has a time frame for the bargaining unit employees and that came and went. So we gave them a two-week extension. And that came and went also. And that's when I filed a grievance.
Q. And, but then the reclassification was issued shortly thereafter?
A. Yes.
Q. And in that reclassification, they found that you were performing work as a GS-9?
A. Yes.
Q. And determined in there, as I recall, that the COR duties that you were performing were grade controlling?
A. Correct.
Q. And my understanding of that is that means that because you were doing those COR duties, that's what bumped you up from a GS-7 to a GS-9?

A. That was my understanding.
Q. Was there anything else about the Position Description that you submitted other than your COR duties that elevated you to a GS-9?
A. I don't believe so.
Q. And so from the Personnel Office in the Forest Service, they did the position -- they did the reclassification?
A. They classified the position, yes.
Q. So they gave the option to the management here in the forest to either promote you to the GS-9 or to redistribute that for the grade controlling duties?
A. That was the direction by Personnel.
Q. Now, the classification, according to my notes, was issued on October 3rd of 2000. Does that sound about right?
A. I believe so.
Q. And then, according to my notes, there was a meeting to discuss the situation on October 19th of 2000?
A. Yes.
Q. Was that meeting held reasonably promptly or did you have some disagreement about any delay in determining what to do with your situation?
A. It was in the time frame.





Q. Okay. That is spelled out in the Master Agreement, too?
A. Well, once you get into a grievance procedure, discussions can take place. It's policy to try and -- to solve the situation at the lowest level.
Q. Okay. Was there any grievance procedure in effect at that time about whether or not to promote you or whether or not to redistribute your grade controlling duties?
A. What time frame are we talking about?
Q. We're talking between October 3rd and October 19th.
A. The grievance was already in effect at the October 3rd date.
Q. Right. But that grievance didn't pertain to the decision whether or not to promote you or redistribute your duties; isn't that right?
(Whereupon, a brief recess was taken.)
(Whereupon, Deposition Exhibit Nos. 1 through 5 were marked for identification.)
Q. (By Mr. Cavan) Kim, I should have mentioned at the beginning of the deposition, any time you want a break, just holler and we can take whatever time is necessary, but hopefully, we'll be able to finish up here before noon. But if you need to break in the





meantime, just let me know.
A. Okay, thanks.
Q. When we took a little break, we started discussing the grievance process that was initiated by you. And I'm handing you what has been marked as Deposition Exhibit No. 1 and ask that you take a minute and take a look at that document and tell me what it is.
A. When I filed the grievance, I tried to get ahold of Dick Judge just to give him a heads-up that that's what I was doing.
Q. And that's the first page of that particular document?
A. Right.
Q. Then the other pages are what?
A. This is my written notice of filing a grievance.
Q. Then that's the actual grievance that was filed?
A. I believe so, yes.
Q. And that was submitted, it appears like, on about September 29 of 2000?
A. Yes.
Q. And so that was prior to the time that the reclassification was completed?
A. Prior?
Q. In fact, one of the issues that you raised in that grievance was that the classification be completed?





A. Correct.
Q. So it was prior to the time that the position was reclassified by Personnel?
A. Correct.
Q. As we discussed, it was reclassified on October 3rd and then you had a meeting with some folks later that month on October 19th?
A. I believe so.
Q. And you had a meeting to discuss the reclassification issue?
A. Yes.
Q. And who was present?
A. I believe it was Dick, Lorri Ghormley probably.
Q. Who was the personnel officer who did the reclassification?
A. Myself, I think Cathy Frey was there.
Q. And what took place at the meeting?
A. Dick outlined his decision to remove the grade controlling duties.
Q. So he was going to remove those COR duties from your position?
A. Correct.
Q. To take you back to the duties of a GS-7?
A. Correct.
Q. And did he tell you why?

A. I believe originally, Dick said that he wanted his organization lined up to have CORs and inspectors and that he felt CORs could be more, I guess, readily used if they had inspectors working under them.
Q. So he wanted more emphasis on more inspectors versus more CORs?
A. I wouldn't say that. He just wanted both in the organization.
Q. I see.
And so you were going to retain your duties as an inspector?
A. Yes, that was my understanding.
Q. But not the COR?
A. Correct.
Q. And was that decision confirmed in writing to you?
A. I believe Lorri Ghormley sent out a notification.
Q. I'm handing you what has been marked as Deposition Exhibit No. 2, and please take a look at that and tell me what that is?
A. It's a message from Lorrie Ghormley, where she states, "you were informed of the decision by management."
Q. How did you respond to that particular decision? I mean, what action did you take in response to that decision?





A. We then began discussions through the union with management to try and figure out the basis that they had made their decision on.
Q. And I'm handing you what has been marked as Deposition Exhibit No. 3. Would you please take a look at that document and tell me what that is?
A. It was a notification that I intended to file a grievance.
Q. A grievance in response to the decision to remove your COR duties?
A. A grievance -- it included that, but it was also that we couldn't get the reasoning -- what we were looking for was like a workload analysis, something to base the reasoning that the duties were removed. That was included in it.
Q. So you were trying to get some information from management about the workload on the forest to see if you could contest the reason for not--
A. Right. The Master Agreement says you can't be arbitrary and capricious in your decision. We were trying to find out.
Q. And did you, in fact, file a grievance after that October 19 meeting?
A. I believe I did.
Q. Handing you Exhibit No. 4, and please take your





time and take a look at that.
A. It was a two-part--
MR. BLACK: Kim, look at the document before you answer. Go through it all before you answer questions about it. Make sure you're familiar with it and you understand it. We can stay all day if we need to.
THE WITNESS: It's a two-part grievance. Part of it on my behalf and part of it on the union's behalf.
Q. (By Mr. Cavan) All right. And the one that was filed in your behalf was what?
A. It was to try and get information so that we, as the union, would know if the decision was arbitrary and capricious. We talked about the statement that management has the right to redistribute grade controlling duties, but they have that right under certain guidelines and provisions. And we didn't feel they had followed those.
Q. So it was a grievance filed in response to management's decision to redistribute your grade controlling duties, at least in part?
A. In part, yes.
Q. That -- I'm now handing you what's been marked as Exhibit No. 5 and ask you to take a look at that for me and tell me what that is.





A. This is a letter to Cathy Frey and myself from Dick Judge, where he's making the statement that he is canceling the grievance concerning both matters.
Q. Okay. This is in response to the grievance that was filed on December 20th, which has been marked as Deposition Exhibit No. 4?
A. I believe so.
Q. So, and he responds to that saying that this grievance in Exhibit No. 4 was not filed timely and he was dismissing it?
A. That was his interpretation.
Q. All right. Was anything -- did you appeal that particular finding or his response to your grievance?
A. This one, I did not. I believe I had, talking to the union representative from the regional office -- he was the regional vice president of the union. Grievances are, I believe, three-tiered. They start at the forest level. They go to forest supervisor and then they move up. As Skip explained to me--
Q. Skip who?
A. Skip Hegman, who is the regional vice president of the union. It's flawed in that when the discussions begin at the forest level, all of the people in the line moving up are included in that. So the decisions -- as you move up, the decisions that were made have already

been -- those people have already been through it for the lower level.

So it's kind of redundant to take it further up. And that's how Skip explains the situation to me.

Q. So in any event, the grievance that was filed as Deposition Exhibit No. 4 was denied and dismissed as of January 18 of 2001 as noted in Exhibit No. 5?

A. Although discussions were ongoing at the time.

Q. But just that question, was that particular grievance dismissed as of January 18, 2001?

A. I believe that the Forest Service gave the notice that they were dismissing it. We were in disagreement.

Q. Okay. But you didn't pursue that particular grievance in any manner?

A. No, at that point, I didn't.

(Whereupon, Deposition Exhibit No. 6 was marked for identification.)

Q. (By Mr. Cavan) Now, the original grievance that you had filed on September 29 of 2000 was still ongoing?

A. We were still in discussions.

Q. And in fact, you filed what's called a Step 2 Grievance to that on or about November 21 of 2000--

A. I believe so.

Q. --does that sound about right?

And I'm now handing you what has been marked as





Exhibit No. 6 and ask you to take a look at that document and tell me what that is.

A. This is correspondence from Janette Kaiser dealing with level two, Step 2 of the grievance procedure.

Q. This was the grievance that was filed originally on September 29 of 2000?

A. Yes, I believe so.

Q. And what is their response to that Step 2 grievance?

A. She goes through the resolutions that were listed in the grievance and talks to whether she feels it's been completed or not.

Q. And she gives you notification of your right to, in some way, appeal this decision?

A. Yes.

Q. And did you file any appeal to this decision of your Step 2 Grievance?

A. No.

Q. And so the grievance that was filed on September 29 of 2000 was dismissed or done by December 11 of 2000?

A. I'm not sure of the dates. I gave up trying to work with the Forest Service in the grievance procedure at about that time.

Q. Okay. But you were notified of their response to your grievance as of a letter dated--





A. December 11th.

Q. --December 11th, 2000?

A. Correct.

Q. And did you receive it on or about that same time?

A. Yes.

Q. And you didn't pursue that, the grievance any further?

A. Correct.

Q. You first contacted an EEO counselor on May 8th of 2001?

A. Correct.

Q. Would you tell me any activity on this issue of reclassification between December 11, 2000 and your contact with the EEO counselor on May 8th of 2001?

A. We had -- I had a final meeting that Skip Hegman had set up on the request of Janette Kaiser. And I believe that was April--

Q. April 27th.

A. I believe so.

Q. Sound about right.

Before we get to that meeting, let's talk about any meetings or any discussions that you had between December 11th and April 27th with management regarding your reclassification.

MR. BLACK: Directly or indirectly?





Q. (By Mr. Cavan) Let's take directly, No. 1. Did you have any contact with management between December 11th, 2000 and the meeting on April 27th, 2001 regarding your reclassification or the removal of your COR duties?

A. Directly with management, I would have to look through. I had a lot of meetings with union.

And there was a meeting -- Mark Woods was in attendance but I don't remember the date of it. I'm not positive.

Q. Who's Mark Woods?

A. We had a meeting down in Dillon, Cathy Frey, Lorri Ghormley, myself and Mark Woods was a fire person. He wasn't -- the meeting with him wasn't related to this in any manner. And when he left the meeting, we then brought up the -- wanted to discuss the grievance. I believe Janette Kaiser was there but I don't remember the date of that meeting.

Q. Would this have been while your grievance was still pending?

A. I believe so, yes.

Q. So that would have been prior to December 11 of 2000?

A. We were still in discussions even after this. So to me, it's all one ongoing.

Q. And I'm just trying to separate that out a little

bit and I want to know if you personally had any conversations with anybody in management about their decision not to reclassify you to a GS-9 or to take away your COR duties?

A. Not that I can recall.

Q. Okay. Tell me about any other activity on this issue between December and April 27th?

A. There was ongoing discussions with the local union representative, Cathy Frey. There was discussions with--

Q. I'm sorry -- take them one at a time. The discussions you're talking about with Cathy Frey, are those discussions that you had with Cathy Frey or some discussions that Cathy Frey had with others?

A. I believe both.

Q. Okay. Let's talk about your discussions with Cathy Frey. When did those discussions take place and describe them for me?

A. We work in the same office. They were ongoing discussions. I couldn't give you exact dates or--

Q. And she's a union person that works in your office here in Butte?

A. She was at that time, yes.

Q. And so you discussed with her your dissatisfaction with their decision to remove those COR duties?





A. Yes.

Q. And what discussions, to your knowledge, did Cathy Frey have with management about that?

A. She tried getting information from Dick. And I know she did that via the computer, phone calls.

Q. What information is that?

A. She wanted, like a workload analysis, something to base his decision on. And I know she talked to Skip Hegman, the union rep from the regional office.

Q. Any other discussions that you're aware of that she had with management other than requesting information from Dick?

A. Not that I'm aware of.

Q. What other dialogue was there then between management and anyone concerning the situation between December and April of 2000?

A. I don't remember. I know Skip Hegman had conversations with Bill Grosvenor.

Q. And Bill is who?

A. He was the Labor Relations Specialist I believe is his title from the regional office.

Q. Regional office of?

A. The Missoula office, the regional office.

Q. So I'm trying to figure out if that's a discussion between two union representatives or is that a





discussion between a union representative and a management person?

A. Union and management.

Q. And do you know what the nature of those contacts were?

MR. BLACK: Well, I'm going to object that that's not the best evidence. We have the e-mails that are available. They are the best evidence.

Q. (By Mr. Cavan) Go ahead.

A. I know that they had discussions via the computer. They had discussed it on a road trip to some meeting that both of them attended.

Q. Discussed your situation?

A. Correct.

Q. And the decision to remove the COR duties?

A. Correct.

Q. Do you know what his position was, that being the person from Missoula, what his position on the issue was?

A. He backed management on the decision, I believe.

Q. Any other discussions that you're aware of on the issue?

A. No. I wasn't privy to all the discussions.

Q. Okay. You then had -- this takes us up to the meeting then on April 27 of 2001?





A. Yes.

Q. And who all was present at that meeting?

A. Cathy Frey, Carolyn Holmes, Skip Hegman, myself, and I think Lorri was there, Lorri Ghormley.

Q. And who called the meeting?

A. Janette had talked to Skip Hegman, asking if there could be another meeting to try and resolve my issues.

Q. Okay. And Janette's position was?

A. She was the forest supervisor.

Q. Was she the head of the whole--

A. Of our forest.

Q. The head of your forest. All right.

And when you say that she wanted to discuss your issues, what was your understanding of what was going to be discussed or did you have one?

A. I believed we were going to discuss the decision of removing the grade controlling duties.

Q. Is there -- to your knowledge, is there any written documentation about what the meeting was going to be about or any letters or correspondence that discussed what you were going to do at this meeting?

A. I believe Skip Hegman had told me via the phone or when he stopped in on the way through, that Janette had requested this meeting, and I sent a note to Janette stating what dates were available. That's the only

stuff I remember on that.
Q. So you went to the meeting. And I know I've seen some various notes of what took place there. But would you please just tell me your general recollection of what was discussed and what happened at that meeting?
A. There were issues discussed on communication and how the whole situation had been handled. Janette said that she had looked through my case and she felt that the decision to remove my grade controlling duties on her -- in her mind, why she was verifying that, was because I didn't do COR duties year-round.
Q. Okay. And what decision was made at that meeting, if any?
A. I believe Janette gave me her final answer as to that she wouldn't consider doing accretion of duties.
Q. And accretion of duties, again, is where you had worked your way in -- or had taken on new responsibilities while -- within your job. Rather than being promoted to a new position, a person just takes on additional duties and therefore, under this accretion of duties, they are promoted. That is a really bad question.
Explain to me the accretion of duties.
A. Accretion of duties is just when, over time, you end up doing more duties than what is in your PD.





Q. And you are promoted on that basis?
A. You have the opportunity to be promoted on that basis.
Q. Okay. Between December 11th of 2000 and this meeting on April 27 of 2001, had you ever been advised by anyone that management was going to reconsider or would reconsider their decision not to reclassify you to a higher grade?
A. My assumption is because of the ongoing discussions, it was a possibility. And I don't remember the date of a message we got from Skip Hegman. I believe he sent that to D.J. also, where he said he had talked to Dick Judge and he was pretty sure that they would have to accrete and that Dick was going to talk to Janette and so just hold on. I believe is what he -- good news is coming is what he thought. I don't remember the date of that e-mail.
Q. But you had never been advised by anybody in management that they may reconsider the decision that had previously been made?
A. Not verbally. I thought just going through the whole process of ongoing dialogue was leading to that.
Q. Other than that e-mail from Skip Hegman that you referred to, did anyone else give you any indication that some decision may still be pending or that they may





reconsider the decision?
A. I thought their actions did.
Q. In what way?
A. In that they were willing to still consider debating the subject.
Q. And when did they give you the indication that they would consider debating the subject, when they agreed to call this meeting on April 27th?
A. Through all the correspondence from the day they won, from the grievance.
Q. After April 27, did you go back being a civil engineering technician?
A. Yes.
Q. And you just didn't do the COR duties anymore?
A. Correct.
Q. Did you miss those?
A. Yes.
Q. It's something that you did enjoy doing?
A. It's something that I trained hard for and I took pride in doing.
Q. I've seen some indication -- I don't know where -- in reading these files, that -- and you've mentioned that today, too, that you found that those duties were stressful?
A. Yes.





Q. And there's some indication also that you wanted to work in Lands rather than Engineering because of the stress that the COR duties put on you?
A. No.
Q. That would not be accurate?
A. That is not accurate. I wanted to work in Lands because the situation in Engineering was becoming difficult, having filed the grievance. I remember one project when D.J. was on detail, I needed some technical advice and I called down to ask if I could get it from either Jim Mickelson or Dick Judge, and I was told people were too busy to come up and help.
I actually thought I would be set up for failure once D.J. was gone. I had a fear of working in Engineering.
Q. Okay. But your desire to work in Engineering had nothing to do with that you found COR work more stressful?
A. No.
Q. You were eventually promoted to a realty specialist as a GS-9?
A. Correct.
Q. And when did that occur?
A. It hasn't been quite a year, I believe.
Q. There were interrogatory answers.

One of the things -- one of the bases of your suit, Kim, is that you feel that you were subjected to a hostile work environment in the U.S. Forest Service. And would you please describe for me why you feel that way.

A. Oh, there was no -- we couldn't get any correspondence, any communication, D.J. nor myself nor Cathy Frey with Dick Judge, who was upper line surveyor in -- or supervisor in Engineering.

Q. Now, he works in Dillon; is that right?

A. Correct.

Q. But he was the supervisor for your office also here in Butte?

A. Right, not immediate supervisor but up line supervisor.

Q. Sure. So you weren't getting enough, you feel, cooperation from him?

A. We weren't getting any communication. Contracts that had been submitted were changed, which was within Dick's right. But that was never communicated back to D.J. or I. So we would get calls from contractors and the copy that we had, which was one we had submitted to Dick, was different than what the contractor had received. So it was embarrassing to try to talk to the contractors when we didn't have the correct contract in





front of us.

Q. So -- I'm sorry?

A. Just the lack of communication that way.

Q. Let me touch on that just for a second now. When you would prepare drawings or plans our whatever, I would imagine they would have to be reviewed by somebody?

A. Correct.

Q. And they would be reviewed by Dick Judge in some circumstances?

A. Yeah, usually D.J. would -- if I did it, D.J. would review it and then it would pass on up the chain.

Q. Or if D.J. did it, Dick would review that also?

A. Correct.

Q. And that was one of his job responsibilities was to review these plans?

A. Correct.

Q. And if he found that something was incorrect or something that had to be changed; it was within his authority to do that?

A. Correct.

Q. In fact, it was his responsibility to do that?

A. Correct, and also to relay that information back to us so we knew what was going on.

Q. So the lack of communication you're talking about,





when he made those changes, he wouldn't let you folks know that he had made those changes?

A. That was part of the lack of communication. If we sent him questions via the telephone or the IBM, we just never got any kind of responses.

Q. Okay. So there was a lack of communication between your office here in Butte and the Dillon office?

A. Correct.

Q. What other things did you feel contributed to your feeling of a hostile work environment?

A. Jim Mickelson made some comments in regards to my having brought up the issues of working outside our Position Description.

Q. And again, we're talking about the meeting that happened back in February of 2000?

A. Right. I didn't find out about those conversations until much later. And I got documents from the people that he talked to, what they had told me he said.

Q. What comments had he made?

A. He was very angry when he talked to Cathy Speich. She didn't tell me his exact verbiage, she just told me he was very angry at me for having brought up those issues. He felt I was complaining, I believe.

Kathy Smith, when she talked to him, he told her





that he didn't care if I stayed in Butte as a GS-7 forever. When I brought that to management's attention--

Q. When did you learn about those comments?

A. I was helping Kathy with a project that she was having a septic tank or a holding tank built and it was being done by a contractor in Butte. And I would have to look at that contract. But that's -- when I went up to help her, that's when she told me about those discussions. So it was quite awhile after the statement had been made that I found out about it.

Q. Did he ever direct similar statements to you directly?

A. No.

Q. All right. What other situations do you think created a hostile work environment?

A. The hostile work environment in Jim's case was the fact that I believe management didn't act on my complaint. They told me that Jim said he didn't remember making the comment. Jim has never verified that with me.

But they didn't even go to the people who had given me their documents to see whether it had actually taken place or not. It was just if Jim said it, he didn't remember it. Then it was dropped.