Q. Okay. What other situations?
A. Jim was upset that he thought I was spending engineering dollars to do my union duties.
Q. Did he make a comment to you about that?
A. No, he made a comment to my supervisor.
Q. That you were expending engineering department funds to advance the union activities or to perform union activities?
A. To perform them, yes.
Q. Okay. Did I see somewhere that he later sent you a letter or something like that apologizing for that comment?
A. Yeah, Jim got into some difficulties with his supervising. And this was after I was not under his supervision anymore. Part of his, what he was directed to do was go to supervisory training classes and I believe he was directed to apologize to anybody that he may have offended during that time period.
Q. So if I recall, he had since learned after making the initial comment, that there are funds available within engineering to do union activities?
A. Correct.
Q. He said he had learned that and he apologized for the previous comment?
A. Correct.





Q. Any other situations that you feel created a hostile work environment?
MR. BLACK: Can she refer to her discovery responses?
MR. CAVAN: Sure.
MR. BLACK: If that would help, Kim.
THE WITNESS: Thank you.
MR. BLACK: Response to No. 4.
Q. (By Mr. Cavan) And for the record, you're reviewing the discovery responses that you provided last Friday, Plaintiff's Responses to Defendant's First Interrogatories and Requests for Production?
A. I believe that's -- yeah.
Q. Did you prepare these particular responses?
A. I had input on them.
Q. Did you prepare the responses themselves?
MR. BLACK: No.
THE WITNESS: Just input.
MR. BLACK: I did. She reviewed them. She verified them. The copy has the verification so--
THE WITNESS: I also, in working with management and trying to resolve this issue, I had asked for like the workload analysis. I asked to check other forests to see if they required their inspectors to become COR certified, because at one point, Dick Judge





had said becoming COR certified helped you in your inspector duties. So I wanted to know if other forests also did that.
I wanted to do a poll. I was told that I couldn't do that. When I asked for the workload analysis, I was told it wasn't germane to the case, and yet on the April meeting, I was told that there had to be workload analysis to decide if there was a need for a GS-9 COR.
I felt like I got a lot of double-talk from the government. I was told, well, it's a budget issue, and yet, I know the forest turned back money. And the forest wanted to advertise a civil engineering tech, slash -- you could either be a tech or a degreed engineer. The difference between what I would have been paid at the 7 level and at the 9 level was 2000 some dollars a year.
The difference between a papered engineer, a degreed engineer would be anywhere from 3- to $5,000 a year. So the money talk didn't make any sense to me. The workload talk didn't make any sense to me. Dick Judge had presented a flip chart at a meeting to discuss my grievance, talking about all the work that was coming in, that he would probably have to bring CORs in. They even asked me if I wanted to detail as a COR at that point when the workload came up.





Q. (By Mr. Cavan) And I guess my question -- I don't mean to interrupt you, but my question is more directed at the issue of the hostile work environment and any actions that were taken against you or any situations that existed in the office that you think created a hostile work environment where you worked?
MR. BLACK: Well, for the record, I'm going to instruct the witness, if she believes that those elements she was explaining constitutes part of the hostile work environment, she should continue--
MR. CAVAN: That's fine.
MR. BLACK: --to testify on that.
And I don't mean to interrupt the dialogue, but I think that enters into the picture. It's justification -- for the record, false justifications can constitute a hostile work environment.
MR. CAVAN: Okay.
THE WITNESS: And when Janette Kaiser first came to the forest, she wanted the issue of the consolidation to be resolved. There were still a lot of issues in that consolidation. So she came to the Butte District. And this was -- we called it her Meet and Greet meeting.
She just came and introduced herself. During that meeting, she told us that she wouldn't put up with any

more issues of the consolidation and she asked if any of us had any problems with that. And people would change the subject and she brought it back to that track I believe three times. And then she started pointing at people and saying, "Do you have a problem? Do you have a problem?"

So when she got to me, I told her I thought she had a big job ahead of her because there were a lot of issues still out there. And my intent was to let her know how damaged I felt people had been. And she told us that if we didn't get over the consolidation issues, she would shoot us.

And when she made that comment, I said well, some of us felt like we've already been shot. And she looked directly at me and said, "Not by my hand, you haven't."

I felt that was hostile.

Q. (By Mr. Cavan) When was that?

A. It was at her Meet and Greet meeting, which was I think February 2000.

Q. Okay.

A. D.J. went on a detail and I was told -- this was during 2000, which was a huge fire year for this forest. And we were -- every person on Butte District was, I believe, involved in supporting the fire suppression in some manner. When D.J. left, I was told, "Okay, you'll





be taking over her duties." So when I inquired about the temporary promotion, Ervin Brooks told me that he wouldn't sign off on the temporary promotion because I was doing mostly fire duties.

I felt that was hostile because not only was I doing the fire duties but I was also doing any engineering duties that were ongoing at that time. Some of the contracts had been shut down because of the fire situation, but there were contracts that were still going. One of them was the one I spoke to where I had asked to get some expert guidance and I couldn't get it out of the Dillon District.

Q. Do you feel that you were subjected to a hostile work environment based upon your gender? Was that the core of any of these situations that you feel created a hostile work environment?

A. I think it played into it. Both D.J. and I couldn't get any communications out of Dick Judge. And I don't know how Randy's interaction was with him at that point. I think it played into it.

Q. Were you subject to any type of sexual harassment in any way?

A. Give me a description of--

Q. Harassment of a sexual nature, either verbally or by conduct?





A. I don't believe so.

Q. I would like to talk to you a little bit about your claim for reprisal in this case. And this may have been straightened out to some degree in your responses to interrogatories. In the Complaint, I believe it says that there was reprisal taken against you based upon your protected EEO activity.

In the response to interrogatories, it appears to clarify that you feel that there was reprisal taken against you not based upon your EEO activities but based upon your union activity. Is that accurate?

MR. BLACK: Well, I want to say for the record, that was my mistake when the Complaint was prepared.

MR. CAVAN: Sure. I just wanted to make sure that--

MR. BLACK: Just so you understand.

MR. CAVAN: Sure.

Q. (By Mr. Cavan) Is that an accurate statement?

MR. BLACK: Don't put in the record that lawyers make mistakes, Chris.

THE WITNESS: Can you tell me which interrogatory we're talking about?

MR. CAVAN: Sure, I think it's No. 5. Interrogatory No. 5.

MR. BLACK: Just take a look at that.





THE WITNESS: Yes, I would say that's correct.

Q. (By Mr. Cavan) So you're not claiming that they took -- that there was reprisal against you based upon your EEO activity?

A. I wouldn't justify that a hundred percent. I think any time you do an EEO activity, at least in the cases that I'm familiar with, that person is pretty much ostracized after the fact.

Q. Let me ask you it this way, was there any action taken against you based upon your EEO activity, any employment action of any kind?

A. I don't believe so, if I'm understanding correctly.

Q. Okay. But do you feel that there was any type of employment action taken against you based upon your participation in union activities?

A. Yeah.

Q. Okay. And what action is that?

A. When we combined the forests, the south end didn't have a union, and there was a ruling that the union would represent both sides once we were combined.

Q. And this again is like in 1995?

A. Yeah. It was early, yeah. At that time, Cathy Frey was the president and I was the vice president and we are the two people that initiated getting the union

started. Management was -- they did not like the fact that the union came to be. And on the south end, they weren't used to working in that facet and there were remarks--
Q. The south end would encompass what?
A. The Beaverhead side of the forest.
At one meeting that Cathy Frey was at -- it was a Leadership Team Meeting, which is management. The rangers, the staff officers all get together and have meetings. Rex Blackwell at the time said that he wouldn't -- he didn't have to do anything that a GS-7 union rep brought up, and Cathy was in his presence when he said that.
Q. And again, my question is directed at employment action that was taken against you based upon your union activities?
MR. BLACK: I'm going to direct the witness to keep explaining because I think this is all contextual material.
Q. (By Mr. Cavan) Maybe I interrupted you. I didn't quite know where we were going there. But that's my question.
MR. BLACK: Keep explaining the background, Kim.
THE WITNESS: I think we were ostracized or





thought of differently because we were representing the group. And the union was not a popular idea with management.
Q. (By Mr. Cavan) Okay. Are you done with your answer?
A. I believe if I'm understanding what you're asking.
Q. Well, I want to know -- I understand that you feel that you were ostracized but I want to know what specific employment action was taken against you based upon that, your union activity or based upon the fact that you were being ostracized?
A. I think the decisions that came out of this grievance were in part related to my union duties.
Q. Was that ever communicated to you in any fashion or is that just a suspicion that you have?
A. It's an assumption I have, based on the way management interacted.
Q. So you feel that the action taken against you in not promoting you and in taking away your COR duties was based upon your participation in union activity?
A. Not solely, but I think that played a factor.
Q. Okay. And you base that assumption on the fact that the background that you just gave us and that you feel, as a union representative, you were ostracized by management?





A. Correct.
Q. Anything else to support that assumption?
A. No, I would have to converse with Cathy Frey probably, so much stuff happened during the course.
Q. You also allege in this case, of course, that -- and in your EEO complaints that the decision that was made with respect to your core duties, COR duties and not promoting you was based upon your gender?
A. Correct.
Q. Why do you feel that this decision was made on account of your gender?
A. Because management in this same time period, as I explained before, had an outreach that said, once you attain your COR certification, you're at the GS-9 level. Randy Scott applied for that job, got it. And once he became certified, even though he wasn't doing COR duties, he was paid at the 9 level.
Q. Okay. So when did Randy Scott do this? When did he become COR certified?
A. I believe it was in 2000.
Q. So you described this earlier in your deposition, you talked about that there was a new GS-9 level position, is that -- that had been advertised?
A. Correct.
Q. And so prior to the time that they issued it to





the general public, people within the organization are given the opportunity to compete for that position?
A. No, just to say that they had an interest.
Q. Just to say they had an interest?
A. Correct.
Q. And are they considered first before it is advertised or how does that work?
A. No. I do not believe they're considered first, no.
Q. So anybody within the organization can apply for it and anybody outside this particular Forest Service can apply for it also?
A. I believe, correct, yes.
Q. And was Randy COR certified at the time he applied for it?
A. No.
Q. Did he become COR certified prior to getting that position?
A. No.
Q. He got the COR certification after he got the position?
A. Correct.
Q. And was he paid at a GS-9 level prior to becoming COR certified?
A. No.

Q. So he had to become COR certified before he attained that level?
A. He applied for the job, got it, and then became COR certified. So he went into the job at the 7 level. And according to the outreach, once you got your COR certification, you would get the 9 level and that's how it worked.
Q. Okay. Now, could you have competed for that job as well?
A. Yes, I could have.
Q. So you were -- you were at a 7 and you could have applied for that, and based upon your COR certification would have been immediately placed at a GS-9?
A. I believe so.
Q. Did you compete for that?
A. No, I didn't.
Q. How come?
A. I just lost my mother-in-law, and I was so ingrained in what was going on with this case, that I was considering giving up working for the Forest Service. Emotionally, I couldn't handle it at that point.
Q. Do any other factors lead you to believe that this decision was motivated by gender?
A. We did have accretion of duties and I was involved





in the Partnership Council meeting where that took place. Cliff McCluskie, who works for one of the districts on the south end, was given an accretion due to his contracting duties in the timber sales arena. And--
Q. When was that?
A. It's written down somewhere. I would have to look.
MR. BLACK: Tim, you guys prepared a chart of all the non-competitive promotions. It's in there. But that was produced in D.J's case.
MS. KITTSON: That's in D.J.'s case, yeah.
MR. BLACK: Carol, you may have done it.
MR. CAVAN: Okay. Cliff McCluskie was non-competitively promoted. All right.
MR. BLACK: I've got it here, too.
Q. (By Mr. Cavan) There's also, in your answer to interrogatories, a Don Rice?
A. Yes, Don Rice -- Cathy Speich, after our meeting where we were told there wasn't any place on the org chart to move us, she decided to apply for a position. It's still under the Engineering/Lands/Minerals Group but it's in the contracting, purchasing arena. And it was an upgrade to an 8 level. So she applied and got that. Don Rice then applied for Cathy's vacated





position which was a 5/7.
Q. And--
A. My understanding was the 7 level was dependent on becoming inspector certified. And most of those jobs say if you can attain that within a year, year's time. Don took the roads test three or four times.
Q. To be an inspector?
A. Yeah, before he could get a passing grade on it. So they -- Don received his 7 before he was ever certified as an inspector. And my understanding was that that was when he got the 5, that was the point that was made, was that he had to get inspector certified to get to the 7 level.
Q. Now, when you originally became a civil engineering technician in 1991, you were a GS-7 at that time; is that right?
A. Yes.
Q. And were you inspector certified at that time?
A. No. Rich Hollamon had gone to Personnel and had a discussion with them but I wasn't privy to the discussion. And when they were done, they said it was a 7 level.
Q. Okay. So you were a 7 without being inspector certified for two or three or four years?
A. Possibly, yeah. The dates I'm not sure of.





Q. Just as Don Rice was?
A. Correct. My understanding with Don was he was told but that was just -- I mean, I never was in on the discussion.
Q. Sure.
But you were pointing out that he was at a GS-7 even though he had not become inspector certified?
A. Correct.
Q. Now, are you aware of other females that were non-competitively promoted in the Forest Service during the same time period?
A. The whole Forest Service?
Q. You know, I don't know. Let's just talk about this forest, I guess.
A. I wasn't aware of any until I saw that list that was produced and I believe H. Hinkle on there is a female.
Q. And you have reviewed -- and I'll just show it to you for the record. There's a handwritten summary of the non-competitive personnel actions between 1998 and August of 2003. And you've reviewed that particular list?
A. I believe I have, yes.
Q. There's more than one female on there, isn't there?

A. Correct.
MR. BLACK: I'm going to object to this exhibit because it lacks foundation for this witness to talk about it.
MR. CAVAN: Sure.
THE WITNESS: One of the things I found interesting with this exhibit is the years before Janette Kaiser came, there were several accretion of duties. Our understanding was Janette Kaiser said there will be no accretion of duties. She later said that that was not her policy. But I believe that's what the forest felt, and Dick Judge has made statements stating that Janette Kaiser will not do accretion of duties promotions. And I think this document shows that they fell dramatically after Janette came to the forest.
Q. (By Mr. Cavan) Okay. And do you feel that Janette Kaiser's policy is based in some way on gender?
A. Well, she gave an accretion of duties to a male and she wouldn't do it to the female.
Q. Janette is a female?
A. Correct.
Q. Any other -- are there other GS-9s working in this forest that you feel are performing the same work that you performed?
A. The civil engineering tech 9s are all under one





PD. We perform those duties.
Q. Okay.
A. Same as a 7. They come out with kind of a canned position.
Q. Who were the GS-9 males from '98 to 2000?
A. Oh, let's see. Well, Randy attained his 9 in 2000 I believe it was.
Q. And that's through the process we just discussed previously?
A. Right. I believe Jim Mickelson was an 11. So in 2000, off the top of my head, I can't think of a male in engineering that was a GS-9.
Q. Okay. I would like to talk to you a little bit about your damages in this case and first about your economic damages. It appears from your Answers to Interrogatories that you're seeking the difference in pay between a GS-7 and a GS-9 from the time that you began performing COR duties until your promotion to Lands. Would that be accurate?
A. Not quite. Since Randy was paid at the 9 level before he performed the duties, I would like to be paid at the 9 level since the date I was certified, which I believe was in '97.
Q. Okay. Through 2003, to the time you were promoted to -- in Lands?





A. Yes.
Q. Now, you had the opportunity to go to GS-9 in 2000 through the position that Randy took--
MR. BLACK: Objection, misstates.
Q. --is that accurate?
MR. BLACK: Objection, misstates the question. She wasn't offered the position.
Q. (By Mr. Cavan) You had the opportunity to seek the position?
A. I could have applied for the position.
Q. Were there time periods within there that you were temporarily promoted to a GS-9?
A. There was. When D.J. took a detail elsewhere off the forest, I was promoted.
Q. And that was in that 2000 time frame?
A. Yes.
Q. How long was that? And the records would verify it. I just wondered if you know off the top of your head?
A. A couple pay periods, three pay periods.
Q. Other economic losses other than that?
A. I would like the Thrift Savings Plan to be brought up to what the government would have been putting in at that pay level. I think we talked about it in this document.





Q. So in any event, the same benefits that a GS-9 would have gotten, you're seeking?
A. Correct.
Q. What about emotional distress damages, you talked about that a little bit in your Answers to Interrogatories. Did you suffer from emotional distress because of this situation?
A. Yes.
Q. When did that begin to manifest itself?
A. The latter part of 2000.
Q. So it didn't occur while you were performing your COR duties, it occurred in late 2000 as a response to this reclassification process?
A. Correct.
Q. And what types of problems did you experience?
A. I couldn't control my emotions at work, which was embarrassing.
Q. In what way could you not control your emotions?
A. I would cry so I avoided work. And then I sought counseling.
Q. Okay. Was that through like a work type program?
A. Yeah.
Q. You had a counselor available to contact?
A. Correct.
Q. How many times did you see her? I think it's

listed here in the interrogatory, but approximately?
A. I would say six to eight.
Q. And you feel that those problems were attributed to management's decision not to promote you?
A. Correct.
Q. Did they affect you, these emotional problems, outside of the workplace? I understand that you became emotional at work and you cried. Did they affect you outside the workplace as well?
A. Yeah. I was losing sleep, became withdrawn, just the classic symptoms of depression.
Q. How long did the situation last?
A. Well, it came to a head in the latter part of the year.
Q. The latter part of 2000?
A. Of 2000. I went to a physician then and got some antidepressants. And it took about, I would say, five weeks for those to kick in.
Q. Okay. Did you feel better after that?
A. Yes.
Q. Are you still taking medications?
A. Yes.
Q. And have you had any problems with depression since being on medication?
A. I believe I can handle the situation with the





medication.
Q. So when the problems were most severe was at the end of 2000 and the beginning of 2001, would that be accurate?
A. I believe so, yes.
Q. Are you still seeing a counselor of any kind or a physician?
A. I still see the physician, not the counselor.
Q. And I imagine the physician is identified in the interrogatories. Is that--
A. Dr. Lisa Sessions.
Q. Here in Butte?
A. Yes.
Q. Is she a mental health professional?
A. An M.D.
Q. An M.D.
(Whereupon, a brief discussion was held off the record.)
Q. (By Mr. Cavan) Maybe you can describe this for me a little bit. I can understand where you felt at the time that you had been performing some work and had not been compensated for that and that you were no longer going to be able to perform that work in the future, the COR duties. Why do you think that that -- why do you attribute that factor to these emotional problems that





you had?
A. I didn't feel I was being treated fairly. And once those duties were removed, I could lose my certification. In the handbook, it says if you don't perform those duties within a certain time frame, you lose them. I was not looking forward to the fact that I may have to take that testing over again. It's difficult testing.
Q. Did you lose it?
A. Right now, I believe I'm still listed as a COR. They're going through a new system of -- it's going to be different from how you got it before. And the contracting officer has approached me and asked me to work on service contracts. I would have to get some more training at this point to be able to do that.
Q. Do you need your COR certification for your work in Lands?
A. No.
Q. I didn't mean to interrupt you. You were explaining to me why you felt this contributed to your emotional distress.
A. I couldn't make sense out of the decision, was my biggest factor and the fact that I was being treated differently than other CORs.
Q. Okay. Anything else?





A. No, I think that covers it.
Q. You also made a claim here that -- of loss of annual leave and sick leave?
A. Correct.
Q. Explain that to me.
A. I found myself just wanting to get out of the office. You know, so if you look at my leave slips, you'll find a lot of days where I would take an hour and a half, two hours at the end of the day, and D.J. was very good in allowing me to do that.
Q. This is annual leave that you were taking?
A. Annual and sick. When I went to the counselor, I took sick leave. There were some days, I just couldn't come in.
(Whereupon, there was a brief interruption.)
THE WITNESS: I dreaded working at that time.
Q. (By Mr. Cavan) Do you know how much annual leave or sick leave that you took that you attribute to this situation?
A. I would have to go through the pay time sheets and add it up.
(Whereupon, a brief discussion was held off the record.)
THE WITNESS: Dr. Sessions did prescribe me some time off while the medication kicked in. And like

one time, there was an ELMO -- every year we do a December luncheon type thing, and I got up that morning and couldn't go so I took time.

Q. (By Mr. Cavan) And your counsel has indicated that you'll make some effort to put together those days that you feel that you missed because of that.

A. Okay.

MR. BLACK: We will.

THE WITNESS: Correct.

Q. (By Mr. Cavan) When did your mother-in-law pass away?

A. In March of 2000.

Q. Did that -- was that an emotional distressful situation for you also?

A. Yes.

Q. And did you miss some work on that account also?

A. Let's see. I believe I did, yes.

Q. Any other events going on in your life during this time period at the end of 2000, beginning of 2001, that were emotionally stressful for you?

A. I don't believe so, no.

Q. Had you ever experienced any depression prior to this time?

A. I had experienced depression early on several years ago. There was a Dr. McGree that I went to, and





my older sister had told me that Prozac helped people lose weight. So I asked him if I could take Prozac for that reason. And so I tried it for a while.

Q. How long were you on Prozac?

A. At that point?

Q. Um-hum.

A. I probably did it for a half a year maybe.

Q. When was that?

A. I would say that was in the '80s, early '80s maybe.

Q. Between the early '80s and 2000, did you ever seek any professional help for depression?

A. No.

Q. Did you ever experience any symptoms of depression, I mean, other than what we all experience? Did you ever experience any type of clinical depression?

A. No.

(Whereupon, a brief recess was taken.)

Q. (By Mr. Cavan) Just a couple of follow-up questions.

Have you ever made any other EEO complaints--

A. No.

Q. --prior to this one?

Have you ever filed any union grievances on your own behalf prior to the one that was filed here?





A. No.

Q. During the same time period -- I know that there's been a lot of economic changes here in Butte with Montana Power and everything else -- were there any economic stresses on your family during this time period possibly involving your husband's work? Where does your husband work?

A. My husband works for NorthWestern Energy.

Q. Were they going through a difficult time during this time period also?

MR. BLACK: I'm going to object to the lack of foundation here. I don't think NorthWestern was even here at that point in 2000, 2001.

MR. CAVAN: I don't know. She could certainly answer that.

Q. (By Mr. Cavan) The reason I'm asking, the stress -- is the stressors that were going on in your life in late 2000, 2001, when you were having these emotional difficulties, I just wanted to find out if there was going -- anything else going on in your family life at this time that may have contributed to that? Was your husband -- who was your husband working for in late 2000, early 2001?

A. I believe if Montana Power -- he worked for Montana Power at that point.





Q. Was his work or job at all tenuous during this time period, 2000, 2001? Were there concerns about that, too?

A. Not that were ever -- I mean, everybody that worked for Montana Power had an apprehension, but he was never told that his job was being looked at or anything like that.

Q. So nothing else during this time period that you can identify as a stressor, emotionally?

A. No.

MR. CAVAN: That's all I have.

THE WITNESS: Thank you.

MR. CAVAN: Thank you very much.

(Whereupon, the foregoing deposition was concluded at 11:58 a.m.)

PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET, SHOWING PAGE, LINE AND REASON, IF ANY, FOR COURT REPORTER'S INSERTION INTO THE ORIGINAL DEPOSITION. DO NOT MAKE ANY MARKS ON THE ORIGINAL DEPOSITION. SIGN THIS SHEET; SIGN DEPOSITION BEFORE NOTARY PUBLIC AT THE END ON LINE PROVIDED; and RETURN THE ORIGINAL DEPOSITION TO THE COURT REPORTER FOR FILING WITH THE CLERK OF COURT OF THIS DISTRICT.

PAGE LINE CORRECTION AND REASON

SIGNATURE HERE AND ON FOLLOWING PAGE

NOTARY PUBLIC FOR STATE OF ____

RESIDING AT
MY COMMISSION EXPIRES ________





DEPONENT'S CERTIFICATE

I, TERESA KIM LANGE, the deponent in the foregoing deposition, DO HEREBY CERTIFY that I have read the foregoing -108- pages of typewritten material, and that the same is, with any changes thereon shown on the preceding page, a full, true and correct transcript of my oral deposition given at the time and place hereinbefore mentioned.

TERESA KIM LANGE

SUBSCRIBED AND SWORN to before me this ______ day of __________________, 2004.

NOTARY PUBLIC FOR STATE OF

RESIDING AT
MY COMMISSION EXPIRES ______





COURT REPORTER'S CERTIFICATE

STATE OF MONTANA)
ss.
COUNTY OF SILVER BOW)

I, CHRISTINE LIVELY, Free-Lance Court Reporter and a Notary Public for the State of Montana, DO HEREBY CERTIFY:

That the witness in the foregoing deposition:

TERESA KIM LANGE,

was duly sworn by me to testify the truth, the whole truth and nothing but the truth in the foregoing cause; that the deposition was then taken before me at the time and place herein named; that the deposition was reported by me in machine shorthand and later transcribed into typewriting under my direction; and the foregoing -108- pages contain a true record of the testimony of the witness.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my notarial seal this ________ day of _______________, 2004.

NOTARY PUBLIC
MY COMMISSION EXPIRES:
MAY 2, 2008

**Lorri Ghormley**
06/06/00 08:50 AM

To: Debbie Gibson/R1/USDAFS@FSNOTES
cc:
Subject:

Let me know if you don't get the enclosed pd. This goes with the reply that I cc'd to you.

Kim Lange

Lorri Ghormley
Beaverhead-Deerlodge/Gallatin/Custer NF's
Personnel Officer
(406) 587-6784

----- Forwarded by Lorri Ghormley/R1/USDAFS on 06/06/00 08:48 AM -----

**Ervin J Brooks**
06/05/00 05:26 PM

To: Lorri Ghormley/R1/USDAFS@FSNOTES, Guy H Adams/R1/USDAFS@FSNOTES, DJ Johnston/R1/USDAFS@FSNOTES, Kim Lange/R1/USDAFS@FSNOTES
cc:
Subject:

Lorri, attached (hopefully) is a revised PD for Kim Lange. This incorporates both the work we are asking her to perform in engineering and added duties in the lands program section. Please add this to your list of things to do for me and complete the classification process on this PD when you can get it scheduled in. Any questions about the PD please give me, Guy, or Kim a call.

Thanks.

Ervin J. Brooks
B-D ELMO Staff Officer
406-683-3979

----- Forwarded by Ervin J Brooks/R1/USDAFS on 06/05/2000 05:22 PM -----

**Guy H Adams**
06/02/2000 12:02 PM

To: Ervin J Brooks/R1/USDAFS@FSNOTES, DJ Johnston/R1/USDAFS@FSNOTES, Kim Lange/R1/USDAFS@FSNOTES
cc:
Subject:

attached is a slightly revised position description for kim. changes are primarily to major duties, knowledge, and complexity with regard to the lands portion. think this is ready to go to personnel. call if questions....

e-mail ghadams@fs.fed.us pd-09.doc

Introduction

This position is located in a Forest Service unit to provide technical engineering work on complete conventional projects of limited scope, or a portion of a larger and more diverse project, and also serves as a Realty Specialist/trainee in support of the Forest Lands Program with responsibilities in a variety of lands activities, including land status, title conveyance, title claims, rights-of-way acquisition, withdrawals, land adjustments, grants, and appraisals. The incumbent works 50% in Engineering and 50% as a Realty Specialist Trainee.

Major Duties

Performs road reconnaissance surveys through areas presenting engineering problems, ordinarily involving high cost of construction. Based on tentative desirable maximum-minimum standards, determines possible route or routes, designates key control points, compiles or makes cost estimate with supporting data and statistics, and submits to supervisor for consideration in selecting the most feasible route.

As required, directs lower-grade technicians in inspections and reporting of route location on low standard roads, reviews reports and makes recommendations for submitting to higher authority.

Makes and/or recommends revised or alternate designs to eliminate or reduce engineering problem areas without undue sacrifice of standards, economy, or esthetics.

Serves as COR/Inspector for administration of construction and maintenance contacts to insure compliance with the terms and conditions of the contract. Projects are of moderate complexity and can usually be completed in a year or less. Issues start and stop work orders to the contractor. Assures compliance by the contractor with the provisions, plans, and specifications of the contract, accepting or rejecting quality and acceptability of equipment used, manner of performance and rate of work progress, interpretation of plans and specifications, and acceptable fulfillment of the technical phases of the contract. Refers points of disagreement to the Contracting Officer. Makes changes requiring contract amendments and modifications involving adjustments in the contract price or time, and recommends final acceptance of the completed project. Instructs the contractor to contact the Contracting Officer whenever subsurface, latent, or unknown physical conditions are encountered. Personally notifies the Contracting Officer of these conditions along with recommendations. Rejects defective materials furnished by the contractor and suspends work not properly performed subject to the final decision by the Contracting Officer. Maintains the official diary on the entire project operation.

Serves as the ER/Inspector of timber purchaser built roads of unusual difficulty and complexity. This includes the interpretation of plans and specifications, and inspection of construction, reconstruction, and improvement of roads, bridges, cattle guards, fences, drainage structures, etc. Inspects purchaser construction activities for contract conformance that includes safety, utilization of materials, esthetics, and recommends action to be taken.

Keeps a record of progress payments. Maintains a file of all documents and records incident to the administration of the contract. Prepares all required orders and correspondence affecting contract administration. Interprets plans and specifications, and provides technical assistance to force account crews involved in transportation system and/or building and utility construction and maintenance. Insures that materials and methods meet required standards. If plans and/or specifications appear to be below standard or in error, makes necessary changes and submits to the responsible official for review.

repares contract plans, estimates, and specifications for construction of oads, bridges, building and utility systems, etc. Is familiar with the technical aspects of assembling the contract documents

As part of assigned cases in land activities, researches appropriate federal, state and county records to extract and prepare federal land status reports and real estate ownership data.

Reviews, evaluates, processes, prepares and recommends various conveyance instruments related to transfer of interest in land, in conformance with accepted Forest Service, Office of General Counsel, and Department of Justice policies and standards. Such documents include, but are not limited to, warranty deeds, donation deeds, quitclaim deeds, and various forms of rights-of-way easements and permits.

For simpler cases, may assume a leading role for case completion when under the direction of a journeyman level lands or realty specialist. This role includes meeting with landowners, other specialists, and other internal and external publics to gather information to complete cases with responsibility for negotiations, arranging meetings, and resolving technical problems.

Responsible for requesting title insurance commitments and policies from various title insurance companies as required. Schedules and performs follow-up actions as needed. Reviews title evidence, identifies title defects and initiates appropriate curative action.

Assembles title dockets for preliminary and final title opinions for review and acceptance by the Regional Title Program Manager and the Office of General Counsel. Coordinates with RO Land Title Specialists to resolve problems on non-routine cases

Assures that plats, exhibits and other supporting documents are complete, accurate, and in compliance with accepted standards.

Participates and assists higher-grade specialists in contacts with land owners, assembles routine real estate transactions for review, and completes such transactions in accordance with clear-cut guidelines and procedures, as directed by journeymen level lands or realty specialist.

Accompanies and assists higher-grade realty specialists and appraisers gathering data for land appraisals. Inspects the property involved, assembles comparable sales information and other real estate market data, and verifies the terms of proposed real estate transactions.

<u>Factor 1, Knowledge Required by the Position</u>

Thorough knowledge of engineering practices, procedures, and techniques.

Knowledge of principles of transportation system planning and analysis to accomplish reconnaissance, design, and coordination.

Knowledge of road and minor structure design, and construction procedures to accomplish design.

Oral and written communication skills in order to prepare and present reports on work projects and to effectively communicate requirements of land transactions to internal specialists, landowners and others.

Knowledge of land forms, soil characteristics, logging systems, photo and map

interpretation, and construction procedures to locate routes.

Knowledge of contract format and applicable specifications to develop new cost estimates and costs for design changes and modifications.

Knowledge of policies and specifications pertaining to preconstruction and contract administration areas leading to certification in all areas.

Knowledge of standard structures such as retaining walls, timber bridges, and major culvert installations to properly administer timber sale and public work contracts.

Knowledge of routine realty instruments, use of supporting title documents, terminology inherent in real estate transactions, and a working familiarity with realty procedures to carry out routine realty assignments. Working knowledge of lands activities including rights-of-way acquisitions, land adjustments, title claims, grants and land status.

Maintains a working knowledge of standard legal processes, documentation, and pertinent Forest Service directives relating to lands activities.

Familiarity with related fields such as minerals, water, soils, timber, and wildlife sufficient to use techniques and knowledge from these disciplines in the development of land adjustment Right of Way acquisitions, title claims and grants cases.

Factor 2, Supervisory Controls

The supervisor outlines requirements, provides information on any related works being performed, and provides general instructions regarding scope of objectives, time limitations, and priorities.

The incumbent independently plans and schedules own work. The supervisor is available for consultation and advice on significant deviations from standard engineering/lands practices, and provides more detailed instructions when new criteria or techniques are involved. Work is observed for progress and coordination with others, and for adherence to completion and cost schedules. Standard methods used are seldom reviewed, but review is made for adequacy and conformance with established policies, precedents, and engineering concepts and land management plans.

The incumbent carries out assignments in accordance with established methods and procedures and clearly defined precedents.

Factor 3, Guidelines

Guides include Agency manuals and handbooks, engineering charts, plans, specifications, and precedents, and other written guides such as Federal and State laws and regulations, and field guides covering both engineering and land acquisition.

Employee must be able to locate and apply reference material to various aspects of assignments.

Works independently in resolving routine problems but obtains approval from supervisor when deviations from established guidelines are necessary.

Factor 4, Complexity

rk consists of a wide variety of moderately complex duties relating to gineering. Assignments involve study, analysis, and consideration of several possible courses of action, techniques and designs, and selection of the most appropriate. Changes or deviations often must be made during progress of an assignment to incorporate additional factors requested after start of the project, or to adjust for conditions which could not be predicted accurately in the original plans.

Incumbent reviews legal instruments and supporting documents, obtains additional information as needed, reconciles discrepancies, and determines whether or not the documents conform to applicable laws, regulations, policies and procedures.

Legal instruments and supporting documents, although somewhat standardized, often vary significantly regarding format, organization, content and function. Incumbent decides on appropriate disposition, monitoring and follow-up, with assistance from Journeyman level realty specialists and/or the Regional Title program Manager in complex or unusual cases.

Under the guidance of higher-grade realty specialists, completes all phases of routine realty cases, including the collection of comparable market data, the research and verification of legal records, and the contacting of land owners to negotiate terms of minor realty transactions with little controversy.

Factor 5, Scope and Effect

The work involves planning and conducting engineering work which requires determining, analyzing, and resolving a variety of conditions.

The work product affects the efficiency with which engineering projects which support resource activities are carried on.

The purpose of the work is to ensure the efficient acquisition, disposal, or exchange of lands to provide for the fullest public use of National Forest System lands consistent with overall land management objectives.

The work facilitates the successful achievement of the Forest's land adjustment, rights-of-way acquisition, title claims and grants programs.

Factor 6, Personal Contacts

Contacts are with coworkers and other unit personnel, prime and subcontractors and their representatives, employees in other government agencies, and manufacturers involved in providing materials for construction projects, specialists in related fields, appraisers, resource managers, attorneys, title companies, private land owners, and the general public.

Factor 7, Purpose of Contacts

Contacts in engineering related work are to plan, direct, coordinate, and/or perform a variety of assignments, requiring the incumbent to resolve operating problems and conditions. It involves dealing with cooperative and uncooperative individuals, requiring substantial tact and skill in influencing or motivating individuals to accomplish the desired result.

Contacts in lands related work are for the purpose of disseminating and exchanging information, explain agency polices and objectives, negotiate agreement in lands activities, and obtaining advice and guidelines.

Factor 8, Physical Demands

ome physical activity is required when making on-the-ground inspections of ongoing perations and inspection of lands involved in a real estate transaction. This activity involves walking and climbing over rough terrain. Other work is performed in an office setting.

Factor 9, Work Environment

Field work involves moderate risks and discomfort when involved in on-the-ground assessments of operations and inspection of lands, such as hot and cold weather, moving equipment, dust noise, and related factors.

Employee may be required to wear protective clothing or use protective equipment, such as hard hat, boots, and goggles. Other work is performed in an office setting.

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Chap. 296-33, Subch.3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 23, 32, 33, and 39)*

1. Actions Requested: Classify

2. Request Number: 00-139

3. For Additional Information Call *(Typed Name and Telephone Number)*

4. Proposed Effective Date

5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* [signature]

6. Action Authorized By *(Typed Name, Title, Signature, and Concurrence Date)* [signature] 6-9-00

**PART B - For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

1. Name *(Last, First, Middle)*: Lange, Teresa K.
2. Social Security Number: 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
3. Date of Birth: 12/30/54
4. Effective Date

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

7. FROM: Position Title and Number (0 - Vacant, 1 - Abolish, 2 - Inactive)

IP: MR:

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

14. Name and Location of Position's Organization
USDA Forest Service - Region One
Beaverhead-Deerlodge National Forest

Org Structure Codes: 11 | 01 | 02 | 0000 | 0

15. TO: Position Title and Number

IP: MR:

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary | 21. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| | | | |

22. Name and Location of Position's Organization
**USDA Forest Service - Region One**
**Beaverhead-Deerlodge National Forest**

Org Structure Codes: 11 | 01 | 02 | 0000 | 0

**EMPLOYEE DATA**

23. Veterans Preference: 1 - None; 2 - 5-Point; 3 - 10 Point/Disability; 4 - 10-Point/Compensable; 5 - 10 Point/Other; 6 - 10-Point/Compensable/30%

24. Tenure: 0 - None; 1 - Permanent; 2 - Conditional; 3 - Indefinite

25. TSP Code

26. Veterans Preference for RIF: YES / NO

27. FEGLI

FEHBA: 1 - Enrolled; 2 - Ineligible; 3 - Waived; 4 - Eligible-Pending; 5 - Cancelled

28. Annuitant Indicator: 1 - Reempl. Ann-CS; 2 - RETO; 3 - RETM; 4 - RETO & CS; 5 - RETM & CS; 9 - Not Applicable

29. Pay Rate Determinant

30. Retirement Plan: 1 - CSR; 2 - FICA; 4 - None; 6 - CSR FFF; C - Offset; E - Offset FFF; K - FERS

31. SCD Leave

AL Category

32. Work Schedule: F - Full-time; P - Part-time; I - Intermittent; G - FT Seasonal; O - PT Seasonal; J - INT Seasonal; H - FT On Call; R - PT On Call

33. Part-Time Hours Per Biweekly Pay Period

NTE Date | Sick Lv Carry-over | Losing/Gaining Dept | Appt Limitation (0 - No, 2 - Yes) | Full Limitation | Balance | Service Year Date

SCD Retirement | SCD RIF | SCD WGI | Supvry/Mgrl Prob | 1-Year Probation | SVC Toward Career | Date Last Entered Present Grade | Quarters Deductions: N/A | Code 2 Per Day

**POSITION DATA**

34. Position Occupied: 1 - Competitive Service; 2 - Excepted Service; 3 - SES General; 4 - SES Career Resrv

35. FLSA Category: E - Exempt; N - Nonexempt

36. Approp. Code

Prom Plan: 0 - N/A; 1 - Competitive; 2 - Career-Compet earlier; 3 - Career ladder; 4 - Career-Position reclass.; 5 - Noncompet change to no higher potential position; 6 - Noncompetitive-other

37. Bargaining Unit Status

38. Duty Station Code: 30 0340 001

39. Duty Station *(City - County - State or Overseas Location)*: Dillon, Beaverhead, Montana

Special Employment Program Code: 00 - N/A; 57 - FJF; 59 - VRA; 54 - Stay in School; 55 - Summer Aid; 63 - Worker Trainee; 73 - COOP ED High School; 74 - COOP ED Associate; 75 - COOP ED Graduate; 78 - Summer/Student Rec.

40. Control/Coop Emp.: 0 - N/A

41. Salary Share: 0 - N/A

42. Seas/Status Quo: 0 - N/A; 1 - Seasonal

43. Type of Appointment: 1 - Career; 2 - Career-Conditional; 3 - Term. Taper. Indefinite; 4 - Competitive Temporary Special Need; 6 - Excepted-Permanent; 7 - Excepted-Conditional; 8 - Excepted-Indefinite; 9 - Excepted Temporary

45. Educational Level | 46. Yr Degree Attained | 47. Academic Discipline | 48. Functional Class

49. Citizenship: 1 - USA; 8 - Other

50. Vietnam Era Vet: Y - Yes; N - No; 08/05/64 to 05/07/75

Special Employee Code: 00 - N/A; 09 - WAE; 45 - YCC; 46 - Enrollee; 35 - Manual Pay

51. Supvry Status: 1 - Supervsr; 6 - Leader; 8 - Nonsupvsr

**PART C - Reviews and Approvals** *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. Rec'd & Logged | 06-15-00 | | C. | | |
| B. Class | [initials] | 10/3/00 | D. | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature | Approval Date

CONTINUED ON REVERSE SIDE

OVER 40

Editions prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

Note to Supervisors: Do you know of additional conflicting reasons for the employee's resignation/retirement? [ ] Yes [ ] No
If "YES", please state these facts on a separate sheet and attach to SF 52.)

## PART E - Employee Resignation/Retirement

### Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. ...e Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address *(Number, Street, City, State, Zip Code)* |
|---|---|---|---|
| | | | |

## PART F - Remarks for SF 50

ADDRESS
Residence/ ____________
Check/ ____________
Earning ____________
Statement ____________
____________

____ Veterans Pref. Code (dd 214 if needed)
____ W-4's – Federal ____ State ____
____ Leave Transfer
____ SF-61 Appointment Affidavit
____ SF-78 Medical/177 Statement of Physical Ability
____ SF-181 Race & Natl Origin
____ SF-256 Handicap
____ I-9 Employment Eligibility
____ Selective Service Registration
____ NCR ________
____ Leave Audit
____ FRICK Separation Form

PMSO
AD-332 ____ Establish MR ____
Establish IP ____ Reactivate ____
...g NTE Date ____

A30 Not eligible to convert to career-conditional appointment
A07 Total employment under this appointment must not exceed (  ) hours
A11 Employment under this appointment must not exceed (  ) working days a year
A15 Total compensation during service year may not exceed 40% of salary for GS-3/1
M01 Appointment affidavit executed (  )
226 Subject to satisfactory record check and inquiry under EO 10450
227 Subject to satisfactory medical
228 Satisfactory medical on file
106 Eligible to earn annual leave since appointment now exceeds 90 calendar days. Credit for annual leave is retroactive to date of initial appointment.
107 Ineligible to earn annual leave because appointment is for less than 90 calendar days.
623 Temporary appointment limited to (  ); ineligible for health and life insurance benefits or civil service retirement.
208 Change of appointing office. Former employing office was (________ Agency/SON)
551 Reflects tour change from full-time
~~552 Reflects tour change from part-time~~
553 Reflects tour change from intermittent
K12 Selected from (________ Merit Promotion Cert#) dated (  )
M32 Tour of duty will be (  )
630 Alternating tour: FT (  ) pay periods, PT (  ) pay periods, INT (  ) pay periods
398 SF-8 furnished
N27 Lump sum payment to be made for any unused annual leave
S48 Reason for termination: Lack of work / Lack of funds / Adverse weather
474 Student returning to school

**Lorri Ghormley**

10/03/00 03:57 PM

To: Dick Judge/R1/USDAFS@FSNOTES, Kim Lange/R1/USDAFS@FSNOTES
cc: Cathy Frey/R1/USDAFS@FSNOTES, Lorri Ghormley/R1/USDAFS@FSNOTES
Subject: Classification

Review is now complete. Please see attached.

position_review_results_K.Lange.doc

Lorri Ghormley
Beaverhead-Deerlodge/Gallatin/Custer NF's
Personnel Officer
(406) 587-6784

United States Department of Agriculture | Forest Service | Beaverhead/Deerlodge/ Gallatin/Custer National Forests | Shared Personnel Office P. O. Box 130 Bozeman, MT 59771-0130

**File Code:** 6150 Classification **Date:** October 3, 2000
**Route To:** *

**Subject:** Results of position review

**To:** Acting Forest Engineer

On June 15, 2000 the Human Resource Office received an approved SF-52 requesting classification of a position description submitted by Kim Lange, Engineering Technician, GS-802-07. On September 15, 2000 the Zone Personnel Officer received an extension of time to September 29, 2000 to finish the classification review. As of the date of this memo the position has been reviewed and the following is the result of that review.

The position description clearly describes work of a GS-9 Engineering Technician. Many of the duty statements within the description came from other classified GS-9 engineering technician position descriptions or lands standard position descriptions at the GS-7 and GS-9 level.

Engineering Technician duties: Are Contracting Officer Representative (COR) duties a requirement of this position? If so, then this position is clearly a GS-9. Ms. Lange has identified in the submitted description that she is expected to become certified as a COR and to function in this capacity, which is the most significant change. The GS-7 position that Ms. Lange is currently assigned to describes inspector duties. Knowledge and complexity of inspector duties is at a lower level than COR duties.

Lands duties: These duties are clearly within the legal instruments examining series, GS-963, and based on the duties expected, this work is clearly at the GS-7 level.

The grade-controlling duties of the position description submitted are within the engineering technician series and will occupy 25% or more of the positions' time, therefore the final classification is Engineering Technician, GS-802-9.

If Management determines that these duties are what is needed and expected then management has the following options:

1) Management may redistribute the grade-controlling duties to another GS-9 or;

2) Proceed to non-competitively promote the employee.

Ms. Lange is currently occupying a temporary promotion and has a not to exceed date of November 4, 2000.

I recommend that Management make a decision on the option they intend to choose and communicate this to Ms. Lange before the temporary promotion ceases.

/s/ Lorri Ghormley
LORRI GHORMLEY
Personnel Officer

United States Department of Agriculture | Forest Service | Beaverhead/Deerl[illegible]/ Gallatin/Custer National Forests | Shared Personnel Office P. O. Box 130 Bozeman, MT 59771-0130

**ile Code:** 6150 Classification **Date:** October 3, 2000

**Route To:** *

**Subject:** Results of position review

**To:** Acting Forest Engineer

On June 15, 2000 the Human Resource Office received an approved SF-52 requesting classification of a position description submitted by Kim Lange, Engineering Technician, GS-802-07. On September 15, 2000 the Zone Personnel Officer received an extension of time to September 29, 2000 to finish the classification review. As of the date of this memo the position has been reviewed and the following is the result of that review.

The position description clearly describes work of a GS-9 Engineering Technician. Many of the duty statements within the description came from other classified GS-9 engineering technician position descriptions or lands standard position descriptions at the GS-7 and GS-9 level.

Engineering Technician duties: Are Contracting Officer Representative (COR) duties a requirement of this position? If so, then this position is clearly a GS-9. Ms. Lange has identified in the submitted description that she is expected to become certified as a COR and to function in this capacity, which is the most significant change. The GS-7 position that Ms. Lange is currently assigned to describes inspector duties. Knowledge and complexity of inspector duties is at a lower level than COR duties.

& ER duties 10/5/00 Lg

Lands duties: These duties are clearly within the legal instruments examining series, GS-963, and based on the duties expected, this work is clearly at the GS-7 level.

The grade-controlling duties of the position description submitted are within the engineering technician series and will occupy 25% or more of the positions' time, therefore the final classification is Engineering Technician, GS-802-9.

If Management determines that these duties are what is needed and expected then management has the following options:

1) Management may redistribute the grade-controlling duties to another GS-9 or;

2) Proceed to non-competitively promote the employee.

Ms. Lange is currently occupying a temporary promotion and has a not to exceed date of November 4, 2000.

I recommend that Management make a decision on the option they intend to choose and communicate this to Ms. Lange before the temporary promotion ceases.

/s/ Lorri Ghormley
LORRI GHORMLEY
Personnel Officer

, Form 50-B
91
)ffice of Personnel Management
Su— 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| ANGE, TERESA K | 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 | 12/30/54 | 09/24/00 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 70 | PROMOTION NTE 11/04/00 | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N8M | REG 335.102 EXC-COMP | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

**7. FROM: Position Title and Number**
CIVIL ENGRG TECHNCN
01011909 N5052

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | 07 | 07 | 33,915.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| 31,762.00 | 2,153.00 | 33,915.00 | .00 |

14. Name and Location of Position's Organization

**15. TO: Position Title and Number**
CIVIL ENGRG TECHNCN
01473102 N5085

| 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| GS | 0802 | 09 | 03 | 36,880.00 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| 34,538.00 | 2,342.00 | 36,880.00 | .00 |

22. Name and Location of Position's Organization
FOREST SERVICE
NORTH REG #REGION1#
BEAVERHEAD-DEERLODGE NAT'L FOR

AG 110102000004000000 PP 20 2000

## EMPLOYEE DATA

23. Veterans Preference: 1
1-None 3-10 Point/Disability 5-10 Point/Other
2-5 Point 4-10 Point/Compensable 6-10 Point/Compensable/30%

24. Tenure: 1
0-None 2-Conditional
1-Permanent 3-Indefinite

25. Agency Use:

26. Veterans Preference for RIF: YES [ ] NO [X]

27. WAIVED

28. Annuitant Indicator: 9 NOT APPLICABLE

29. Pay Rate Determinant: 0

30. Retirement Plan: K FERS AND FICA

31. Service Comp Date (Leave): 11/07/80

32. Work Schedule: F FULL TIME

33. Part-Time Hours Per Biweekly Pay Period:

## POSITION DATA

34. Position Occupied: 1
1-Competitive Service 3-SES General
2-Excepted Service 4-SES Career Reserved

35. FLSA Category: N
E-Exempt
N-Nonexempt

36. Appropriation Code:

37. Bargaining Unit Status: 0634

38. Duty Station Code: 30-0180-093

39. Duty Station (City - County - State or Overseas Location): BUTTE SILVER BOW MT

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

46. Employing Department or Agency: DE  TMENT OF AGRICULTURE

50. Signature/Authentication and Title of Approving Official
DONNA D BEECHER
DIR, OFF HUMAN RESOURCES MGMT

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| AG 11 | 5027 | 09/22/00 |

45

3-Part 50-315
2 - OPF Copy - Long-Term Record - DO NOT DESTROY
Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

AG 110102000004000000 PP 20 1*2000*BATCH 50275571 000-00 201-05 AG/EO 11-5027

U.S. Office of Personnel Management
FPM Supp. 296-33, Subch.3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39)**

1. A[redacted]s Requested: Temporary Promotion NTE 90 Days 11/4/00
2. Request Number: 00-173
3. For Additional Information Call (Typed Name and Telephone Number)
4. Proposed Effective Date
5. [redacted] Requested By (Typed Name, Title, Signature, and Request Date)
6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date): [signature] 9-14-2000

**PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)**

1. Name (Last, First, Middle): Lange, Teresa K.
2. Social Security Number: 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
3. Date of Birth: 12/30/54
4. Effective Date: 9-24-2000

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 703 | Promotion NTE (11-04-00) |
| **5-C. Code** | **5-D. Legal Authority** |
| N8M | Reg. 335.102 except to comp |
| **5-E. Code** | **5-F. Legal Authority** |
| | |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |
| **6-C. Code** | **6-D. Legal Authority** |
| | |
| **6-E. Code** | **6-F. Legal Authority** |
| | |

**7. FROM: Position Title and Number** (0 - Vacant, 1 - Abolish, 2 - Inactive)

Civil Eng. Tech

IP: 01011909 MR: N5052

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| GS | 0802 | 07 | 07 | 33915 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

**15. TO: Position Title and Number**

Civil Eng. Tech

IP: 01473102 MR: N5085

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary | 21. Pay Basis |
|---|---|---|---|---|---|
| GS | 0802 | 09 | 03 | 36880 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $34,538.00 | | | |

14. [redacted]me and Location of Position's Organization
**USDA Forest Service - Region One**
**[redacted]erhead-Deerlodge National Forest**

Org Structure Codes: 11 | 01 | 02 | 0000 | 04

22. Name and Location of Position's Organization
**USDA Forest Service -**

Org Structure Codes: 11 | 01 | 02 | 0000 | 04

**EMPLOYEE DATA**

23. Veterans Preference: 1 - None; 2 - 5-Point; 3 - 10 Point/Disability; 4 - 10-Point/Compensable; 5 - 10 Point/Other; 6 - 10-Point/Compensable/30%
24. Tenure: 0 - None; 1 - Permanent; 2 - Conditional; 3 - Indefinite
25. TSP Code
26. Veterans Preference for RIF: YES / NO
27. FEGLI
FEHBA: 1 - Enrolled; 2 - Ineligible; 3 - Waived; 4 - Eligible-Pending; 5 - Cancelled
28. Annuitant Indicator: 1 - Reempl. Ann-CS; 2 - RETO; 3 - RETM; 4 - RETO & CS; 5 - RETM & CS; 9 - Not Applicable
29. Pay Rate Determinant
30. Retirement Plan: 1 - CSR; 2 - FICA; 4 - None; 6 - CSR FFF; C - Offset; E - Offset FFF; K - FERS
31. SCD Leave
AL Category
32. Work Schedule: F - Full-time; P - Part-time; I - Intermittent; G - FT Seasonal; O - PT Seasonal; J - INT Seasonal; H - FT On Call; R - PT On Call
33. Part-Time Hours Per Biweekly Pay Period

NTE Date: 11-04-00
Sick Lv Carry-over
Losing/Gaining Dept
Appt Limitation: 0 - No; 2 - Yes
Full Limitation
Balance
Service Year Date
SCD Retirement
SCD RIF
SCD WGI: 09-24-00
✓ Supvry/Mgrl Prob
1-Year Probation
SVC Toward Career
Date Last Entered Present Grade: 09-24-00 ✓
Quarters Deductions: N/A; Code 2 Per Day

**POSITION DATA**

34. Position Occupied: 1 - Competitive Service; 2 - Excepted Service; 3 - SES General; 4 - SES Career Resrv
35. FLSA Category: E - Exempt; N - Nonexempt
36. Approp. Code
Prom Plan: 0 - N/A; 1 - Competitive; 2 - Career-Compet earlier; 3 - Career ladder; 4 - Career-Position reclass.; 5 - Noncompet change to no higher potential position; 6 - Noncompetitive-other
37. Bargain Unit Status
38. Duty Station Code: **30-0340-001**
39. Duty Station (City - County - State or Overseas Location): **Dillon, Beaverhead, Montana**
Special Employment Program Code: 00 - N/A; 57 - FJF; 59 - VRA; 54 - Stay in School; 55 - Summer Aid; 63 - Worker Trainee; 73 - COOP ED High School; 74 - COOP ED Associate; 75 - COOP ED Graduate; 78 - Summer/Student Req.
40. Control/Coop Emp.: 0 - N/A
41. Salary Share: 0 - N/A
42. Seas/Status Quo: 0 - N/A; 1 - Seasonal
43. Type of Appointment: 1 - Career; 2 - Career-Conditional; 3 - Term, Tapar, Indefinite; 4 - Competitive Temporary Special Need; 6 - Excepted-Permanent; 7 - Excepted-Conditional; 8 - Excepted-Indefinite; 9 - Excepted Temporary
45. Educational Level
46. Yr Degree Attained
47. Academic Discipline
48. Functional Class
49. Citizenship: 1 - USA; 8 - Other
50. Vietnam Era Vet: Y - Yes N - No; 08/05/64 to 05/07/75
Special Employee Code: 00 - N/A; 09 - WAE; 45 - YCC; 46 - Enrollee; 35 - Manual Pay
51. Supvry Status: 1 - Supervsr; 6 - Leader; 8 - Nonsupvsr

**PART C - Reviews and Approvals (Not to be used by requesting office.)**

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| [redacted]d Logged | [initials] | 9-15-00 | C. cc. Colleen | 9-22-00 | |
| ACT 9-25-00 (3) ✓ | [initials] | | D. | | |

2. [redacted]al: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature: [signature]
Approval Date: 9/22/00

CONTINUED ON REVERSE SIDE

Editions prior to 7/91 Are Not Usable After 6/30/93

46

(Not Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement? ☐ Yes ☐ No
If "YES", please state these facts on a separate sheet and attach to SF 52.)

Filling in behind Diane Johnston (on Detail)

PART E - Employee Resignation/Retirement

**Privacy Act Statement**

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address *(Number, Street, City, State, Zip Code)* |
|---|---|---|---|
| | | | |

F. Remarks for SF-50

...ESS
Residence/ ____________
Check/ ____________
Earning ____________
Statement ____________
____________

______ Veterans Pref. Code (dd 214 if needed)
______ W-4's -- Federal ______ State ______
______ Leave Transfer
______ SF-61 Appointment Affidavit
______ SF-78 Medical/177 Statement of Physical Ability
______ SF-181 Race & Natl Origin
______ SF-256 Handicap
______ I-9 Employment Eligibility
______ Selective Service Registration
______ NCR ____________
______ Leave Audit
______ FRICK Separation Form

PMSO
...D-332 ______ Establish MR ______
...tablish IP ______ Reactivate ______
Chg NTE Date ______

- A30 Not eligible to convert to career-conditional appointment
- A07 Total employment under this appointment must not exceed ( ) hours
- A11 Employment under this appointment must not exceed ( ) working days a year
- A15 Total compensation during service year may not exceed 40% of salary for GS-3/1
- M01 Appointment affidavit executed ( )
- 226 Subject to satisfactory record check and inquiry under EO 10450
- 227 Subject to satisfactory medical
- 228 Satisfactory medical on file
- 106 Eligible to earn annual leave since appointment now exceeds 90 calendar days. Credit for annual leave is retroactive to date of initial appointment.
- 107 Ineligible to earn annual leave because appointment is for less than 90 calendar days.
- 623 Temporary appointment limited to ( ); ineligible for health and life insurance benefits or civil service retirement.
- 208 Change of appointing office. Former employing office was (__________ Agency/SON)
- 551 Reflects tour change from full-time
- 552 Reflects tour change from part-time
- 553 Reflects tour change from intermittent
- K12 Selected from (__________ Merit Promotion Cert#) dated ( )
- M32 Tour of duty will be ( )
- 630 Alternating tour: FT ( ) pay periods, PT ( ) pay periods, INT ( ) pay periods
- 398 SF-8 furnished
- N27 Lump sum payment to be made for any unused annual leave
- S48 Reason for termination: Lack of work / Lack of funds / Adverse weather
- 474 Student returning to school

47

via IBM
response requested by 10/24
R 10/23

**Kim Lange**
**09/29/00 04:35 PM**

To: Dick Judge/R1/USDAFS@FSNOTES
cc: Lorri Ghormley/R1/USDAFS@FSNOTES, Cathy Frey/R1/USDAFS@FSNOTES
Subject: Grievance

Dick, I tried to call you twice today to give you courtesy notification of this action. I missed you both times, but did leave messages asking you to call me back. I don't see any reason this matter can't be worked out but feel I have to take this action to get the ball rolling. You will receive a signed hard copy in the mail. New Microsoft Word Document.doc

Kim Lange
Engineering/Lands
Beaverhead-Deerlodge N.F, Butte MT

In reference to Position Classification Review

Master Agreement Article 14, paragraph 3 states: Findings will be reported in writing or by DG to the employee no later that 90 days from the employee's request.

My request was received by management (Personnel) on June 15th; this date was reported to me by Debbie Gibson. Cathy Frey, Local 701 President, was contacted by Lorri Ghormley on Sept. 15th and asked if an extension could be granted. Cathy said she thought I would agree to a two-week extension.

Today being Sept. 29th, and as of 1630 having not received a response in writing, this is formal notification of my filing a grievance.

Nature of the grievance: Master Agreement was violated as outlined above; time frame having been breached. I also feel that my role in the Union has brought negative repercussion my way.

Summary of the issues: I have been lead to believe this forest doesn't want or intend for me to achieve a higher graded position. I have come to this conclusion based on information shared with me by co-workers and personal experience. Last year at an ELMO meeting the Engineering faction met as a sub-group. Jim Mickelson asked me if I had an issue to bring forward. I told him not at this time, as I needed further time to do some research. This issue dealt with the fact that Randy Scott, Cathy Speich and myself were all either qualified or in a short time could become qualified by the Engineering Certification Program as COR/ERs. Randy and Cathy only needed to pass the oral exams, scheduled in a few months. This was the research I wanted to wait on before bringing up this issue. I had passed the previous year. Cathy, Randy and I had talked about the fact that in the standard position descriptions a GS 802-07 has inspector duties, while the GS 802-09 includes COR/ER duties. We all wondered if we would be expected to perform the duties of a 9 but remain classified and paid as sevens.

Jim asked me two more times if I wanted to discuss an issue. He said something to the effect that if I had an issue we might as well talk about it now.

I then told the group I was putting on my Union hat and stated once again that I felt this discussion was a bit early. I asked both Jim and Dick Judge what they planned to do once all three of us were qualified as COR/ERs. Dick said that the organizational chart didn't have slots for upgrades. Jim said that we would not be upgraded. I told the group that this was managements right, but we needed to be worked within our job descriptions. I also stated that I felt we had been lead down a false trail. We were not asked what testing we would like to take for the Engineering Certification Program - we were told what test we were to take. This was misleading as we had interpreted this action as being what the forest would be needing and using us for in the future. Jim made the statement that he also thought we would be made COR/ERs. Both Jim and Dick said we should look at this training as making us more mobile, to which I made the statement that as I looked around the table the only person I saw who might be mobile was Jim. By this

time Jim was so mad his chin was quivering. I tried to tell both Jim and Dick that this type of action was not happening just on our forest, that it is a wide spread issue and that I just wanted to let them know that folks would resort to asking for desk audits if we were worked outside our job descriptions.

I thought we left the meeting with the understanding that we would not be promoted and work would be redirected if it were outside the job description. I was disappointed that we would not be upgraded, but knew this was a right of management. A few weeks later, Ervin Brooks asked us all to upgrade our position descriptions to reflect what our duties were.

Sometime after the meeting Jim went to Cathy Speich. She said he was really mad at me. She tried to tell him that I was speaking for her and Randy also, as a representative of the group. She said it was like he wouldn't acknowledge that I was speaking on behalf of the others beside myself. Cathy didn't tell me what Jim's comments were, only that he was really mad at me.

Kathy Smith told me that Jim had also gone to her and made the comment: "I don't care if that Kim Lange stays in Butte as a 7 forever".

DJ Johnston related to me that Jim had said to her that I was costing engineering money when I did my union duties. He asked her how much time I was spending on union business. I told DJ that the union has a management code that is funded off the top and that is what I charged my union time to.

A member of management came to me and told me that the former Forest Supervisor had asked this person why I was being so negative. This person told the former Forest Supervisor that I was bringing forward the feelings of the bargaining unit members, not my own feelings. Some members of management on this forest have a very negative attitude toward the union, and those of us who have a role as union representatives are therefore looked at with a negative slant. I understand that some management people don't, nor will they ever, like the "union". This is a personal issue, but if they are representing the Forest they need to play the role they are getting paid to do.

As I contemplate a stagnant career, the fact that I have not received a position classification review in a timely manner and the fact that my union duties are looked upon in a negative light, I ask the following as a resolution:

1) A position classification be completed by Oct. 5, 2000
2) A meeting take place with Personnel, Guy Adams, Dick Judge, Cathy Frey and myself as to the strengths and weaknesses of the job classification in relation to a GS 9
3) A meeting take place with Guy Adams, Dick Judge, the ELMO Staff Officer, Gary Howard, Cathy Frey, DJ Johnston and myself discussing what they see as possible advancement opportunities, if any, for me.